# CHARLESTON.

UNITED FUEL GAS COMPANY *v.* PUBLIC SERVICE COMMISSION

(No. 6197)

Submitted March 14, 1928.     Decided March 20, 1928.

1. PUBLIC UTILITIES—*While a Public Utility May be Required, Under Reasonable Rules and Regulations, to Serve Every Applicant Requiring Service Within Territory it Professes to Serve, it Cannot be Required to Extend That Service Outside of Such Territory.*

   While a public utility may be required, under reasonable rules and regulations, to serve every applicant requiring its service within the territory it professes to serve, it cannot be required to extend that service outside of such territory. (p. 607.)

2. SAME—*Public Duty of Utility Largely Determined by Service it Professes to Render, and What Such Profession Covers is Question of Fact Rather Than Law.*

   The public duty of a utility is largely determined by the service it professes to render, and what such profession covers is a question of fact rather than of law. (pp. 608, 609.)

3.   SAME—*Fact That Public Utility by Special Contract Extends
     Service to Some Persons Living Without Limits of Terri-
     tory Where Required to Furnish Service to All, Will Not
     Generally Require it to Furnish Like Service to Others
     Outside of Such Territory.*

     The fact that a public utility by special contract extends
     service to some persons living without the limits of the terri-
     tory where it is required to furnish service to all, will not
     generally require it to furnish like service to others outside
     of such territory.   (p. 607.)

HATCHER, JUDGE, absent.

     Original Jurisdiction.

     United Fuel Gas Company, Petitioners asks the Court to
review and reverse order of Public Service Commission requir-
ing gas company to continue to furnish natural gas to certain
persons named therein and to others who may apply for such
service and comply with lawful rules and regulations of com-
pany, until permitted to discontinue by order of commission.

                    *Order of commission reversed and set aside.*

     *B. J. Pettigrew* and *Harold A. Ritz,* for petitioner.
     *F. M. Livezey,* for respondent.

MILLER, PRESIDENT:

     On the petition of the United Fuel Gas Company we are
asked to review and reverse an order of the Public Service
Commission requiring the gas company to continue to furnish
natural gas to certain persons named therein and to others
who may apply for such service and comply with the lawful
rules and regulations of the gas company, until permitted to
discontinue such service by order of the commission.

     In the year 1916, C. E. Hanson and three others applied to
the United Fuel Gas Company for natural gas from its high
pressure line running along Elk River about three-quarters
of a mile from the nearest applicant's residence.   The appli-
cation, signed by the parties, provides: "This application,
when accepted by you, shall together with your present rules
and regulations, printed on the reverse side hereof, and such
other reasonable rules and regulations as may hereafter be

adopted by you, constitute a contract between you and the undersigned applicant.'' Rule 14 printed on the back of the application under the general head, ''Additional Rules for Consumers outside of Towns and not on Low Pressure Plants'', is:

> "14. The line from which the gas is supplied by the company is not intended and cannot be maintained solely for service to scattered consumers in country districts, and the company reserves the right at any time to cease furnishing gas through such line, either temporarily or permanently, and to change, repair or remove such line, or change the use of it. Any contract for service from such line may be terminated either by the consumer or the company, upon thirty days' notice from one to the other. The company shall not be liable for any deficiency to the supply caused by the use of pumping or compressor stations, breakage of lines, or other causes on account of anything done under the provisions of this paragraph."

Pursuant to the acceptance of these four applications by the gas company, it laid 3856 feet of one inch pipe from its high pressure line to the neighborhood of where some of the applicants lived. The applicants extended lines to their respective dwelling houses; and the company began the service of furnishing gas to them. In June 1917, J. L. Gillespie, J. L. Meadows, and H. D. Cabell, by letter, applied to the gas company for service from its one inch line. The second paragraph of their letter reads as follows:

> "We recognize that the service through said one inch line may not be adequate and that you may, at any time you desire, take up said one inch line and discontinue service. We therefore agree in consideration of the foregoing that in the event we do not obtain satisfactory service through the proposed connections or in the event you shall hereafter at any time desire to take up said one inch line and discontinue service, we will make no objection thereto."

In addition these applicants signed formal applications similar to the one set out above, which were accepted by the company. They extended the lines constructed by some of the other consumers, and were furnished meters and service by the gas company.

In the spring of 1927, the company gave notice to the five consumers then using gas, that it would, on April 30th, discontinue the service. These five consumers applied to the Public Service Commission for relief, praying that an order be entered requiring the gas company to continue the service. The commission held that the company could not limit or restrict its public duty by private contract, and that while the commission may not pass upon the validity of a private contract, it could disregard the provisions of such a contract where it attempts to limit the public duty of the company or to restrict or limit the duties or powers of the commission.

Admitting this proposition as correct, what is the public duty of the utility in the premises? While it may be true that a public utility must serve every applicant within the community, it professes to provide service for, under reasonable rules and regulations, is there proof in the record before us that the United Fuel Gas Company or the applicants for gas, when the service was contracted for and begun, understood that the company was entering the new field permanently, so as to place upon the company a public duty to continue the service thus established and to furnish gas to others applying for the same?

The line from which the gas is now being furnished is a high pressure line extending from the company's field of production to the city of Charleston: the 3856 feet of line laid by the company to the vicinity of the applicants' homes was second-hand, one inch pipe, laid on top of the ground: the consumers' houses are evidently located some distance apart, from the fact that it required some 6700 feet of additional pipe to make connections with the company's one inch service line. Whatever may be the legal effect of the contracts made by the parties, they are evidence of the fact that neither the company nor the consumers understood that the

gas company was entering the field for permanent or regular service.  It appears to be conceded that the company could not have been compelled in the first instance to enter the new field of operation and serve but four, or even seven, consumers, under the circumstances.  And it now appears that, because of leaks, it will be necessary to reconstruct practically all of the one inch line.  One of the consumers testified that it would be necessary to reconstruct all the line to prevent leaks; and another that the most of the line is in bad condition.  One of the company's officers testified that 80% of the line would have to be replaced.  The company's general superintendent testified that it would cost twenty-five cents per foot to lay a two inch pipe in place of the old, or fifteen to eighteen cents for a one inch pipe.  And it appears that if the gas company is to be required to provide an adequate supply of gas a two inch pipe will be required.  The consumer J. L. Gillespie testified that: "We never had enough gas during the winter months when all seven consumers were on the line"; and in part the present consumers base their case on the theory that others will be added to the service from time to time.  Thus it appears that if the company is to be required to continue service, it will be at as much expense and labor as in the first instance.  While we do not take into consideration the probable profit or loss to the company, the commission found that the annual gross receipts from sale of gas would amount to about $200.00.

While it is true that a public utility may be required to serve every applicant within the territory it professes to serve, it can not be required to extend that service outside of such territory.  "To generalize from all cases that have been discussed, it would seem to be proper to say that one who undertakes a public service owes a duty to serve every member of the public within his profession.  That which in the quaint language of the earlier cases may seem a mere conceit, really is practically the truth of the matter.  One who undertakes public employment has, in effect, thereby proposed and vested an interest of himself in all the king's subjects that will employ him in the way of his trade.  But the duty as

thus defined is not to all men but to a certain public limited in various ways according to the usual profession. Thus a gas company owes its duty only to those who occupy premises within the territory covered by the service." 1 Wyman on Public Service Corporations, sec. 344. This rule seems altogether reasonable; otherwise a gas company could be compelled to tap its high pressure lines at any point for the benefit of a few applicants, install pressure reducers and lay pipe to the applicants' houses, regardless of the reasonableness of the proposition.

The Supreme Court of Oklahoma has held, *In Re Vance, et al.*, 241 Pac. 164, that: "The corporation commission has no authority to require a public utility to furnish natural gas to people living outside the city limits where the utility has never professed or undertaken to serve the people of that community generally, even though it may appear that the gas company has a pipe line in close proximity to the property of such persons." It is noted that the decision in that case is partly based on the fact that the utility had not "undertaken to serve the people of that community generally"; but it was held in *Younts* v. *Southwestern Telephone Company*, 192 Fed. 200, that the fact that a telephone company, not required to furnish service outside of the limits of the city where it was operating, supplied service to some persons outside the city, did not require it to furnish such service to others outside the city limits, the court saying: "The defendant had the right to build and maintain a line some distance from its lines as a gratuity or a special favor. Whether it was prompted to do so by the expectation of more subscribers along that line or as a matter of grace to the particular persons is immaterial. It is only when these facilities are granted generally to persons similarly situated as the plaintiff that the refusal to extend to him the same privileges may become a discrimination within the meaning of the statute;" citing *In Re Illinois Cent. Ry.* v. *Dunnigan*, 95 Miss. 749, 24 L. R. A. (N. S.) 503.

"Public profession not only establishes public obligation, but it largely determines the extent of public duty. Just as people can not be forced to serve unless they have made pub-

lic profession, so they can not be forced to serve beyond what their profession covers. The primary question is, therefore, what their profession fairly covers; and this is again a question of fact rather than of law.'' Wyman, sec. 250. See also *Oklahoma Nat. Gas Company* v. *Corporation Commission*, 88 Okla. 51, 31 A, L. R. 330, and note.

The evidence adduced before the public service commission, now in the record before us, does not show such conduct on the part of the United Fuel Gas Company as to constitute a holding out or profession on its part that it had any intention to develop new territory for the vending of its gas as a commercial proposition when it contracted with Hanson and the others to supply them with gas from its high pressure line leading from the area of production to the point of general distribution, but rather that the service was installed gratuitously or as a special favor to those consumers. The contracts, and especially the letter of Gillespie and .others, clearly show that the applicants recognized the temporary character of the undertaking.

There being no evidence of profession or holding out on the part of the gas company to extend its field of service to the territory occupied by the petitioners before the public service commission, and no legal duty appearing, the commission was without jurisdiction to make the order complained of.

The order of the commission will be reversed and set aside.

> *Order of commission reversed and set aside.*