INTERSTATE COMMERCE COMMISSION ET AL. *v.* OREGON-WASHINGTON RAILROAD & NAVIGATION CO. ET AL.

No. 23. Argued November 8, 9, 1932.—Decided January 9, 1933.

*Mr. J. Stanley Payne,* with whom *Mr. Daniel W. Knowlton* was on the brief, for the Interstate Commerce Commission, appellant.

16

18

*Messrs. William C. McCulloch* and *James M. Thomp-son,* with whom *Mr. I. H. Van Winkle,* Attorney General of Oregon, was on the brief, for the Public Utilities Commissions of Oregon and Idaho, appellants.

*Mr. Arthur C. Spencer,* with whom *Messrs. Henry W. Clark* and *James M. Souby* were on the brief, for the Oregon-Washington Railroad & Navigation Co., appellee.

*Mr. Ben C. Dey,* with whom *Messrs. Guy V. Shoup* and *Alfred A. Hampson* were on the brief, for the Southern Pacific Co., intervener-appellee.

MR. JUSTICE ROBERTS delivered the opinion of the Court.

The Public Service Commission of Oregon filed a complaint with the Interstate Commerce Commission, against eleven railroads, including the Oregon-Washington Railroad & Navigation Company, asserting they had failed and refused to provide reasonable and adequate transportation facilities to an area of some 33,000 square miles within the State. The prayer was that one or more of them be required to extend or build a line of railroad from a point near Crane, to Crescent Lake, or some adjacent point. Several municipalities and commercial organizations, and the Public Utilities Commission of Idaho, were given leave to be heard in support of the petition. The respondents answered that public necessity and con-

venience would not be served by the proposed construction and that there was no authority in law for granting the requested relief. After hearing, the Commission entered an order requiring Oregon-Washington Railroad & Navigation Company to " extend its line of railroad, now terminating near Burns, Oreg., from, or near, a station thereon designated as Crane, Oreg., to a connection with the Cascade line of the Southern Pacific Company at, or near, Crescent Lake, Oreg." [1]

The Oregon-Washington Company thereupon filed a petition against the United States, in the District Court, to set aside, annul and suspend the order and to enjoin the Government, its officers and agents, from enforcing the Commission's mandate. The Southern Pacific Company intervened in support of the petition, and the Interstate Commerce Commission, the Public Utilities Commissioner (the successor of the Public Service Commission) of Oregon, and the Public Utilities Commission of Idaho, were permitted to intervene, and participated in the defense of the suit. From a decree setting aside the order and granting an injunction the three intervening defendants appealed. The United States refused to join in the appeal, and a summons and severance was duly served upon it. The appellees insist that if we should reverse the decree as to the appellants the United States would remain bound by its terms; that we may not pass upon the merits in the absence of the Government, a necessary party, and should therefore dismiss the appeal for want of jurisdiction. We shall first dispose of the question thus presented.

Before the Commerce Court was established suits to enjoin orders of the Commission were brought against that body, and appeals from the judgments rendered were

---

[1] 159 I. C. C. 630. The order contained ancillary provisions which it is unnecessary here to recite.

prosecuted by it in its own name.[2] The Act of June 18, 1910,[3] created the Commerce Court, defined the jurisdiction and regulated the procedure of that tribunal, and authorized a direct appeal to this court. The Urgent Deficiencies Act,[4] under which this suit was instituted, abolished the Commerce Court, transferred the jurisdiction theretofore vested in it to the several district courts, and made the procedure therein the same as that previously followed in the Commerce Court. Existing statutes were repealed only insofar as inconsistent with the new jurisdiction conferred on district courts.[5]

Section 4 of the Commerce Court Act directed

" That all cases and proceedings in the commerce court [now District Court] which but for this Act would be brought by or against the Interstate Commerce Commission shall be brought by or against the United States, and the United States may intervene in any case or proceeding in the commerce court [District Court] whenever, though it has not been made a party, public interests are involved."

Other sections permit the Commission, or complainants before the Commission, or any party in interest in a proceeding before that body, or any other interested party, to become parties to a suit involving the validity of an order of the Commission; forbid the Attorney General

---

[2] *Interstate Commerce Commn.* v. *B. & O. R. Co.,* 145 U. S. 263; *Interstate Commerce Commn.* v. *C., R. & P. Ry. Co.,* 218 U. S. 88; *Interstate Commerce Commn.* v. *Goodrich Transit Co.,* 224 U. S. 194; *Interstate Commerce Commn.* v. *B. & O. R. Co.,* 225 U. S. 326.

[3] Chap. 309, 36 Stat. 539, §§ 1–6.

[4] Act of October 22, 1913, c. 32, 38 Stat. 208, 219, 220. See U. S. C., Tit. 28, §§ 47 and 48.

[5] Those portions of the Commerce Court Act which remained in force, and the new provisions substituted for those superseded, may be found in the U. S. Code, Tit. 28, §§ 41 (27) and (28), and 43–48, inclusive, as amended by Supplement V, Tit. 28, §§ 41 (27), 44, 45, 45a, 46, 47, 47a and 48.

to control, dispose of, or discontinue the suit against the objection of anyone so becoming a party; allow the intervenor to prosecute, defend or continue the proceeding unaffected by the action or non-action of the Attorney General; and accord to any aggrieved party the right of appeal to this court.[6]

The Commission, by entering its appearance in the District Court, became a party defendant, as did the two state utilities commissions. The court below decided adversely to all these bodies. They are aggrieved parties granted a review by § 2; the Interstate Commerce Commission for the reason that the decree set aside its order,

[6] Section 5 enacted " That the Attorney-General shall have charge and control of the interests of the Government in all cases and proceedings in the commerce court, and in the Supreme Court of the United States upon appeal from the commerce court; . . . *Provided,* That the Interstate Commerce Commission and any party or parties in interest to the proceeding before the commission, in which an order or requirement is made, may appear as parties thereto of their own motion and as of right, and be represented by their counsel, in any suit wherein is involved the validity of such order or requirement or any part thereof, and the interest of such party;" [for " Commerce Court " read " District Court "]. And further: " That communities, associations, corporations, firms, and individuals who are interested in the controversy or question before the Interstate Commerce Commission, or in any suit which may be brought by anyone under the terms of this Act, or the Acts of which it is amendatory or which are amendatory of it, relating to action of the Interstate Commerce Commission, may intervene in said suit or proceedings at any time after the institution thereof, and the Attorney-General shall not dispose of or discontinue said suit or proceeding over the objection of such party or intervenor aforesaid, but said intervenor or intervenors may prosecute, defend, or continue said suit or proceeding unaffected by the action or nonaction of the Attorney-General of the United States therein."

By section 2 it was ordained: " That a final judgment or decree of the commerce court [District Court] may be reviewed by the Supreme Court of the United States if appeal to the Supreme Court be taken by an aggrieved party within sixty days after the entry of said final judgment or decree. . . ."

the state commissions because they officially represent the interest of their states in obtaining adequate transportation service.

Though the present appellants were parties in the court below, as of right, and not by grace or favor, were aggrieved by the decree, and have a right of appeal, the appellees maintain this court may not hear and decide the case in the absence of the United States. While admitting intervenors' right to be heard as to the substance of the decree the District Court entered against the Government, the appellees assert the appellants have no standing in this court to ask modification or reversal of the decree as it affects the United States when the latter seeks no review.

We may concede that, unless the Act so directs, a reversal at the suit of the appellants will not affect the judgment as respects the United States. The injunction will stand as against the United States and its agents, because unchallenged by that defendant. Summons and severance does not cure the defect, for though the United States has been severed by that process, if this court should reverse the decree as to other parties, but allow it to remain in force against the Government, the appeal would be a vain thing. The appellants, however, contend that the legislation creates an exception to the ordinary rule governing our jurisdiction. They assert that the purpose of Congress is to permit proper parties in the District Court to carry the litigation to a final conclusion in this court.

The statute clearly provides that in the trial of the case the intervening parties shall not be foreclosed by the action or nonaction of the Attorney General. Even though he concludes not to defend, they are permitted to do so. If notwithstanding their defense a decree goes against them and the United States, can it have been the purpose of Congress that the failure of the Attorney

General to prosecute an appeal concludes such intervenors? We think not. So to hold would render meaningless and superfluous § 2 of the act, which permits a review of the action of the court below " if appeal to the Supreme Court be taken by an aggrieved party . . ." The section can be given effect only by holding that an aggrieved party may challenge the decree not only to vindicate his own rights, but those of the United States as well. Congress evidently intended the Attorney General should represent and protect the interests of the United States as such, but should not at any stage control the litigation against the objection of the other parties and to their disadvantage; and that any aggrieved party might obtain a decree which the United States could have secured had it defended the action or prosecuted an appeal.

This conclusion is confirmed by comparing the form of § 5 of the Commerce Court Act as first presented and as subsequently altered by amendment. The section as originally introduced precluded the Commission and its attorneys from taking any part in suits brought to review its orders. This provision was stricken out in committee. The clause giving the Attorney General control of such cases was also modified. The stated purpose of the amendments was to prevent his forestalling the Commission or any other interested party desiring to litigate the questions involved.[7] The movers of the amendments which were ultimately incorporated in the act insisted that a party affected by the order should have the right to follow the case " through the Commerce Court and Supreme Court "; and that "A party litigant should always have the right to follow his case to final judgment."

---

[7] House Report No. 923, 61st Cong., 2nd Sess., p. 158; Cong. Rec., Vol. 45, Part 5, p. 5524. Senate Report 355, Part 2, pp. 5, 6, 7, 61st Cong., 2nd Sess. Cong. Rec., Vol. 45, Part 5, pp. 4604, 4607; Part 6, pp. 6406, 6445, 6451, 6462.

An official may be designated to stand in judgment on behalf of the United States, so that a decree against him binds the Government.[8] As has been stated, this was the accepted practice in suits by and against the Commission prior to the adoption of the Commerce Court Act. The new legislation might have left the rights of the United States arising out of orders of the Commission to be thus determined in the court of first instance and on appeal. But Congress had undoubted power, in naming the United States as the defendant in such suits, to give the Commission, and others having an interest, authority to litigate the validity of such orders, and, regardless of joinder by the Attorney General, to obtain by appeal a review effective as to the United States. The act plainly exhibits this purpose. Should a reversal be required the mandate may vacate the judgment against the United States though it did not join in the appeal. We think that review may not be denied for want of a necessary party, and we are therefore brought to a consideration of the merits of the cause.

The Oregon Short Line owns all of the capital stock of the Oregon-Washington Company, and the Union Pacific owns all the capital stock of the Short Line; these three companies, with the Los Angeles and Salt Lake, make up the Union Pacific System. The main lines of the Union Pacific Railroad extend from Council Bluffs, Iowa, and Kansas City, Missouri, to Ogden, Utah. The Short Line runs from a connection with Union Pacific at Granger, Wyoming, to Huntington, Oregon. From Huntington the Oregon-Washington follows a northwesterly direction to the Columbia River, thence along the south bank of that stream to Portland. Branches extend southerly and westerly from the main line between Huntington and Portland, east of the Cascade Mountains, but the company

---

[8] See *Minnesota* v. *Hitchcock*, 185 U. S. 373, 387–388; *Johnson* v. *Fleet Corporation*, 280 U. S. 320, 326–327.

28

operates no lines south of Portland and west of the Cascade Range. Crane, just beyond which the required extension would begin, is in eastern Oregon on a line known as the Ontario-Burns Branch, which connects with the Oregon Short Line at Ontario, forty miles south of Huntington, and runs westward to Crane, 127 miles, and thence northwest 30 miles to Burns. The extension would run west from Crane across central Oregon a distance of 185 miles to Crescent Lake, which is on the Cascade Line of the Southern Pacific. The latter operates lines from Ogden, Utah, and New Orleans, Louisiana, to San Francisco, and from Roseville, California, on the Ogden-San Francisco line, to Sacramento and Portland. To Portland it has two alternate main lines between Black Butte, California and Eugene, Oregon, that on the west, the original main line, passing through Medford, Grants Pass and Roseburg, and a newer line to the east, known as the Cascade or Natron cut-off, passing through Klamath Falls, Kirk, Chemult, Paunina, Crescent Lake, the western terminus of the required extension, and Natron.

Prior to 1913 the railways of the Union Pacific and Southern Pacific were jointly operated under control of the Harriman interests. A cross-state line was then planned to run from Malheur Junction, just south of Ontario, Oregon, to Eugene. The Natron cut-off between Eugene and Weed was also in contemplation. In 1911 construction of the cross-state road was begun at both ends. 73.6 miles were completed from Ontario to Juntura; and eastward from Eugene 40 miles were built as far as Oakridge. Work on the Natron cut-off was begun and proceeded through Klamath Falls to Kirk, 127 miles. The line would have joined with the Natron cut-off at Odell Lake, just north of Crescent Lake, the present proposed terminus.

In January, 1913, this court, in *United States* v. *Union Pacific R. Co.*, 226 U. S. 61, 470, declared control of South-

ern Pacific by Union Pacific through stock ownership offensive to the Sherman Anti-Trust Act, and the combination was dissolved. All work on the Oregon projects ceased and was not resumed, except that in 1915 the Ontario-Juntura line was extended to Riverside, 92.7 miles, and in 1916 to Crane, an additional 34 miles.

After the passage of the Transportation Act the Oregon Public Service Commission applied to the Commission under paragraph 21 of § 1 of the Interstate Commerce Act as amended, asserting that the cross-state line was needed and asking that some one or more of the respondents named in the complaint be ordered to build it; and further requesting that the Commission require completion of the Natron cut-off and order certain other railroad construction in central Oregon. The Southern Pacific voluntarily assumed the completion of the Natron cut-off and to that end was granted a certificate of public convenience and necessity under § 1 (18). The Oregon-Washington also applied for and obtained a certificate for construction of the branch from Crane to Burns. Other applications by various carriers were granted. The Commission then dismissed the complaint, holding that the record was not adequate to support the requested order.[9]

On May 24, 1927, the Oregon Commission filed the present complaint against eleven railroads, including the Oregon-Washington, the Oregon Short Line, the Southern Pacific, and others serving the State, and also the Union Pacific. The failure and refusal to provide railroad facilities to a large area of central Oregon was the gravamen of the complaint. Consequences of the neglect to build this line were enumerated as prevention of the development of a vast area, hindrance of exploitation of the natural resources of the State, unreasonably circuitous routes, with consequent delays, and car shortages, all causing

---

[9] Construction of Railroad Lines in Eastern Oregon, 111 I. C. C. 3.

losses to the people of Oregon. The relief prayed was an order that one or more of the respondents be required to construct the cross-state line, from Crane to Crescent Lake.

This line, 185 miles in length, after leaving Crane would traverse about 20 miles of swampy area and 15 miles of alkali flats, and would then pass over the Great Sandy or High Desert for 115 miles. The region is in part sparsely settled and in part wholly uninhabited, and contains no towns except Crescent and Crescent Lake, at the western extremity, neither of which has a population of 100. There is no town within 20 miles north or south of the proposed line. Certain of the lands have possibilities of cultivation through irrigation, and the evidence for complainants is that if the railroad were built such activity would be stimulated. There seems to be no dispute that traffic to be obtained from the region will fall far short of supporting the line. The appellants are of opinion that sufficient traffic for this purpose may be secured by diverting to the new line freight originating west of the Cascade Range, and now moving east on the Southern Pacific through Ogden. In the total haul between Crescent Lake and Granger, Wyo., the route via the cross-state line would be some 214 miles, or 11%, shorter. Neither the Oregon-Washington nor any other portion of the Union Pacific System serves the territory south of Portland and west of the Cascade Mountains. The Southern Pacific lines cover this area. Freight may, however, be routed either over the Southern Pacific via Ogden, or over the Union Pacific via Portland and Granger, Wyoming. The latter furnishes a reasonably short route with adequate and quick service. Inasmuch, however, as the freight originates in Southern Pacific territory, very little is sent over the Union Pacific, the Southern Pacific routing it so as to obtain the long haul. The contention is that even if the proposed line were constructed the same condition

would obtain and that the Union Pacific System could get little or none of the traffic from western Oregon, unless in addition to the cross-state line the Oregon-Washington should build across the Cascade Range into the agricultural counties now served by the Southern Pacific.[10]

The Union Pacific System, composed as above stated, has a total trackage of 15,045.17 miles. The required extension would add 1.2 per cent. to the existing mileage, and can be constructed at a cost of between $9,900,000 and $11,700,000. The finding of the Commission is that operation of the line will not seriously affect the ability of the Union Pacific System adequately to serve the public. Recognizing that the Oregon-Washington has not the necessary funds, and perhaps cannot borrow them, the order permits the financing of construction by advances from the Union Pacific Railroad, which is found to be in position to make them. Union Pacific and the Oregon-Washington consider the venture unprofitable and wasteful, and have refused to make the investment. In the Commission's judgment, the railroad, if constructed, while not profitable at first, will ultimately obtain valuable traffic for the Union Pacific System, will aid the Ontario-Burns branch, which now operates at a serious deficit, and consequently prove a remunerative investment. The court below held,[11] as we must, that these findings, based upon evidence, may not be disturbed.

---

[10] The court below found: " 5. The proposed line in large part would extend through a sparsely settled desert waste which the petitioner has not undertaken or professed to serve. One of the dominant purposes of the order complained of was to provide for the construction of a new east and west line of railroad, whereby lumber traffic originating hundreds of miles from petitioner's present line may find a shorter route to eastern markets, and traffic from southwestern Idaho may find a shorter route to northern California points."

[11] The court below said: " If we were at liberty to review this testimony independently of the findings made by the commission, we might find no little difficulty in reaching the same conclusion." 47 F. (2d) 252.

The appellees' challenge of the order as beyond the power of the Commission was sustained by the District Court, and this decision is assigned as error. The Commission thought its authority to order extension of existing lines was without limitations, save the two which are expressed in paragraph 21,—that public necessity and convenience require the construction, and that the building and operation of the road will not impair the ability of the carrier to render adequate public service. Having determined that the requested extension complied with both conditions the Commission ordered the road built.

Prior to the adoption of the Transportation Act, 1920, the Commission had no authority to authorize or to compel extensions of existing lines of railroad. Such power as existed in that behalf rested in the States. In a number of cases this court passed upon and defined the authority of a State to require extensions of existing service and facilities.[12] Orders made were attacked as compelling the companies, against their will and judgment, to devote property to the public service without compensation, con-

---

[12] *Wisconsin, Minnesota & Pacific R. R.* v. *Jacobson,* 179 U. S. 287; *Michigan Central R. Co.* v. *Michigan R. R. Commn.,* 236 U. S. 615 (requirement of track connections and facilities for interchange of traffic); *Minneapolis & St. Louis R. Co.* v. *Minnesota,* 193 U. S. 53 (erection and maintenance of depots); *Missouri Pac. Ry. Co.* v. *Kansas,* 216 U. S. 262; *Atlantic C. L. R. Co.* v. *North Carolina Corp. Commn.,* 206 U. S. 1; *Chesapeake & O. Ry.* v. *Public Service Commn.,* 242 U. S. 603 (orders relating to passenger service to be rendered and train schedules to be maintained); *Phoenix Ry. Co.* v. *Geary,* 239 U. S. 277 (requirement that a street railway company double-track a portion of its lines); *Chicago & N. W. Ry. Co.* v. *Ochs,* 249 U. S. 416 (extension of a sidetrack as a public track and as part of the railroad's property and system for the service of a private plant); *Norfolk & Western Ry. Co.* v. *Public Serv. Commn.,* 265 U. S. 70 (requirement that railroad provide certain facilities for removal of freight from its premises).

trary to the guaranty of due process. They were sustained, however, upon the express ground that the railroads had undertaken the service and must supply facilities adequate and reasonably necessary to its performance. The requirements were found not to involve the rendition of a new or different service from that to which the owners had agreed when they dedicated their property to a public use. Where, however, the State's mandate involved the rendition of a service beyond the agreement of the carrier, the order was annulled.[13]

The regulations adopted by the States were not uniform; statutory authority to order additions and extensions existed in some States and not in others. Congress was informed of this condition, and urged to exercise the federal power to promulgate a uniform system of regulation of interstate commerce.[14] Legislation to effectuate this purpose was enacted.

---

[13] *Missouri Pacific Ry. Co.* v. *Nebraska*, 164 U. S. 403, 417; *Oregon R. & N. Co.* v. *Fairchild*, 224 U. S. 510; compare *Northern Pac. Ry. Co.* v. *North Dakota*, 236 U. S. 585, 595.

[14] See 33d Annual Report of the Interstate Commerce Commission, 1919, p. 3, where the following quotation is given from a statement furnished by the Commission to the Senate Committee on Interstate Commerce:

" In some of the States the State officers are authorized to require such extensions, but in such cases they are necessarily primarily concerned with, if not confined to, a consideration of State traffic. Some of the States have not vested such authority in any State official. Ordinarily such extensions would be desired for the purpose of facilitating or making possible the transportation of interstate traffic. The desirability of uniformity is obvious. The exercise of Federal authority should not depend upon whether or not the State has acted and should not be different as to the State that has legislated on the subject and the State that has not so legislated. It therefore seems desirable that the Congress should exercise its jurisdiction in this regard in a plenary way and that where such extensions are desired in connection with the movement of presently existing or prospective

By act of May 29, 1917,[15] new paragraphs were added to § 1 of the Interstate Commerce Act; and by the Transportation Act, 1920,[16] these were amended and others inserted. As a result paragraphs 10 to 17 inclusive, all dealing with car service, were given their present form. Paragraphs 18 to 20 inclusive first appear in the Transportation Act. They regulate voluntary extensions of lines or building of new lines, require a certificate of convenience and necessity therefor, and prescribe the procedure for obtaining it. The paragraph with which we are here concerned, numbered 21, was also added by the Transportation Act. It is:

"The Commission may, after hearing, in a proceeding upon complaint or upon its own initiative without complaint, authorize or require by order any carrier by railroad subject to this Act, party to such proceeding, to provide itself with safe and adequate facilities for performing as a common carrier its car service as that term is used in this Act, and to extend its line or lines: *Provided,* That no such authorization or order shall be made unless the Commission finds, as to such extension, that it is reasonably required in the interest of public convenience and necessity, or as to such extension or facilities that the expense involved therein will not impair the ability of the carrier to perform its duty to the public. Any carrier subject to this Act which refuses or neglects to comply with any order of the Commission made in pursuance of this paragraph shall be liable to a penalty of $100 for each day during which such refusal or neglect continues,

interstate traffic and the carrier is unwilling to construct them, it may, upon proper showing and after full hearing, be required to do so by the Federal tribunal."

Compare *Alabama & Vicksburg Ry. Co.* v. *Jackson & Eastern Ry. Co.*, 271 U. S. 244, 248, 250.

[15] Chap. 23, 40 Stat. 101.

[16] Chap. 91, § 402, 41 Stat. 456, 476.

which shall accrue to the United States and may be recovered in a civil action brought by the United States."

The appellants maintain that if the Commission finds the conditions stated in the proviso exist, the power given to compel a carrier " to extend its line or lines " is unlimited and the way is open for an order to extend for any distance, at any cost; for the purpose of developing virgin territory hitherto unreached by railroads, or for supplying competition in a remote region served by other carriers.

The phrase " and to extend its line or lines " is part of a single sentence committing to the Commission the power to require carriers to provide safe and adequate facilities for car service as defined in the act. The reasonable conclusion is, therefore, that the extensions mentioned have to do with car service, and are not intended to create a wholly independent subject of jurisdiction. In the proviso the furnishing of facilities and extension of lines are blended as belonging in a single class. We should expect, if Congress were intending to grant to the Commission a new and drastic power to compel the investment of enormous sums for the development or service of a region which the carrier had never theretofore entered or intended to serve, the intention would be expressed in more than a clause in a sentence dealing with car service. As said in *Interstate Commerce Commn.* v. *Los Angeles*, 280 U. S. 52, 70:

" If Congress had intended to give an executive tribunal unfettered capacity for requisitioning investment of capital of the carriers and the purchase of large quantities of land and material in an adverse proceeding, we may well be confident that Congress would have made its meaning far clearer and more direct than in the present meager provisions of the Transportation Act."

Moreover, if the purpose were that claimed by the Commission support should be found in legislative history. But none has been called to our attention. In the

report to Congress for 1919 the Commission reiterated an outline of the policies previously suggested for legislative action in view of the approaching termination of federal control.[17] No intimation is given that carriers should be required to build into territory they had not undertaken to serve. The scope of the recommendation was not enlarged in the testimony before the committee of the Senate having the Transportation Act in charge.[18]

The terms of paragraph 18, by contrast, throw light on the meaning of paragraph 21. The former presupposes voluntary action by a carrier, and provides that no company shall undertake " the extension of its line of railroad, *or the construction of a new line of railroad,* . . . unless and until there shall first have been obtained from the Commission a certificate that the *present or future* public convenience and necessity require or will require " the construction and operation thereof. The difference of phraseology in the two paragraphs emphasizes the distinction between extensions and new lines. The diversity is significant.

The purpose of Congress in enacting paragraph 18, as repeatedly explained by this court, was that though a carrier should desire to extend existing facilities or to construct new ones in territory not previously served, the free

---

[17] In that report the Commission says, at p. 2:

" 3. Limitation of railway construction to the necessities and convenience of the Government and of the public and assuring construction to the point of these limitations. . . . The thought underlying the second part of this suggestion is that a railroad having been permitted, by public franchise and the powers that go with it, to build into a given territory, it should be required to properly serve and develop that territory. And in developed territory it is important to provide for the extension of short branch or spur lines or spur tracks to communities and industries that should be served and that can furnish sufficient traffic to justify such extension."

[18] Hearings before the House Committee on Interstate and Foreign Commerce, in H. R. 4378, Vol. 1, p. 53, 66th Cong., 1st Session.

exercise of discretion should not be permitted, but the Commission must be convinced that the proposed venture would not drain the railroad's resources and disable it from performing those duties of public service under which it then rested, with consequent detriment to the public in the matter of service and rates.[19] If a railroad company can prove that the proposal either presently or in the reasonably near future will be self-sustaining, or so nearly so as not unduly to burden interstate commerce, the Commission may issue a certificate authorizing the proposed line. Paragraph 21, on the other hand, contains no provision whatever for new lines. If the power be as broad as contended by the Commission there seems to be no good reason for the omission. The same principles and the same needs might equally require the building of a new line as the extension of an existing one, unless, indeed, Congress recognized a radical difference between compelling embarkation in a new venture and ordering a mere extension of facilities required as the natural concomitant and complement of those presently used for the rendition of the service to which the carrier has committed itself.

That paragraph 21 refers to the service the carrier has bound itself to render is further emphasized by the omission to make the future public convenience a factor to be considered. A presently existing public need is expressly stated as prerequisite to the compulsory extension of a line. On the other hand, paragraph 18, which covers voluntary construction, conditions approval on present or future convenience or necessity. Congress therefore drew a distinction between what might be permitted and what compelled. These differences in the two sections were

---

[19] See *Texas & Pac. Ry. Co.* v. *Gulf, C. & S. F. Ry. Co.*, 270 U. S. 266, 277; *Chesapeake & O. Ry. Co.* v. *United States*, 283 U S. 35, 42. Compare *Transit Commission* v. *United States*, 284 U. S. 360.

disregarded by the Commission, and are overlooked by the appellants.

We are told that if paragraph 22 be given due weight the word " extend " in 21 must have a broader connotation than we attribute. This paragraph enacts that the powers conferred upon the Commission by paragraphs 18 to 21, both inclusive, are not to " extend to the construction or abandonment of spur, industrial, team, switching, or sidetracks, located or to be located wholly within one state. . ." The argument is that if the phrase " to extend its line " be so limited as to apply only to existing commitments of the carrier it becomes synonymous with the matters excluded from the Commission's jurisdiction by paragraph 22, with the result that the one becomes contradictory of the other in the matter of line extension. The practice in the application of paragraphs 18 and 21 negatives this view. In *Alabama & Vicksburg Ry. Co.* v. *Jackson & E. Ry. Co.*, 271 U. S. 244, an order of the Commission made under paragraph 21 was sustained which directed the building of a connection between two railroads for interchange of traffic near the outskirts of Jackson, Mississippi. In *Railroad Commission* v. *Southern Pacific Co.*, 264 U. S. 331, 283 U. S. 380, it was held that under paragraphs 18–21 a certificate was required for the necessary rearrangement of main tracks to comply with an order of the Railroad Commission of California that the interstate carriers entering Los Angeles should combine in the construction and use of a union depot. The court called attention (264 U. S. 345) to the palpable distinction between the main line tracks of an interstate carrier and its spur, industrial, switching or sidetracks, and declared the act exhibited the legislative intent to retain within the control of the Commission any substantial change in the former. Although under the station plan the proposed extensions of lines and main tracks were not great in distance, they involved a new intramural desti-

nation for each railway attended by great expense. As was said, the necessary outlay might well be such as to cripple the railroads and hamper their service. Such an extension was held to require the finding of the Interstate Commerce Commission that the changes would not impair the ability of the carriers to perform their public duties. (Compare *Texas & Pac. Ry. Co.* v. *Gulf, C. & S. F. Ry.*, 270 U. S. 266.)

From what has been said it is plain that an extension, though something other than a team, switching, industrial or side track, need not, in order to be distinguished therefrom, be a building into a new and previously unserved locality.

The cases above cited, dealing with the powers of state authorities in the matter of extensions of lines and service, furnish a background which must have been in the minds both of the Commission and of the Congress at the time of the passage of the Transportation Act. Those decisions show that due process is denied by requiring service which goes beyond the undertaking of the carrier. Orders for extensions of line were sustained whenever reasonably required in the interest of car service and for interchange of traffic. No extension ordered for the service of new territory had been approved.[20] Wherever the state attempted to enforce a regulation or demand extension of

---

[20] See the cases passing on state commission orders, cited *supra,* notes 12 and 13; also those cited in note 24, *infra.* The same rule has been applied in the case of other public service corporations. Gas or electric light or telephone companies may be compelled to extend their facilities within the territory covered by the franchises granted them: *New York & Queens Gas Co.* v. *McCall,* 245 U. S. 345; *New York ex rel.* v. *Public Service Comm.,* 269 U. S. 244. But they may not be compelled to extend their lines beyond these limits or to serve other communities. *Southern Bell Tel. Co.* v. *Calhoun,* 287 Fed. 381; *State* v. *Pub. Serv. Comm.,* 287 Mo. 522; 229 S. W. 782; *Oklahoma Nat. Gas Co.* v. *Corp. Comm.,* 88 Okla. 51; 211 Pac. 401; *United Fuel Gas Co.* v. *Pub. Serv. Comm.,* 105 W. Va. 603; 144 S. E. 723.

40

facilities outside the company's undertaking to serve the public, the power was negatived for the very reason that the attempted exercise called on the railroad company for something beyond its agreement.[21]

The Act, reasonably construed, distinguishes between three sorts of facilities,—new lines, or extensions, voluntarily undertaken (¶ 18); compulsory extensions within the area which the carrier has bound itself to serve (¶ 21); and spur, industrial, team, switching or side tracks located wholly within one State, which are left within state control (¶ 22). The second class is distinct from the others and embraces, as the decisions show, a substantial field. But this field is not, as the Commission holds, coterminous with that created by paragraph 18. If it were, power would exist to compel a carrier having lines reaching Chicago and St. Louis, but none connecting those cities, to build a railroad between them. Though in truth a new line, the appellants would call this an extension of the existing lines. If the grant of authority is broad enough to support the order in the present case it would also justify such a hypothetical requirement as we have supposed. We cannot so read the statute, but think the power granted by paragraph 21 is confined to extensions within the undertaking of the carrier to serve, and cannot be extended to embrace the building of what is essentially a new line to reach new territory.

There is another consideration which supports the construction adopted. Our duty is to construe the statute, if fairly possible, so as to avoid not only the conclusion that it is unconstitutional, but also grave doubts upon that score.[22] The views advanced by the appellants, to say the least, raise serious questions in this respect. The rail-

[21] See note 13, supra; note 24, infra.

[22] Carey v. South Dakota, 250 U. S. 118, 122; Russian Volunteer Fleet v. United States, 282 U. S. 481, 492; United States v. LaFranca, 282 U. S. 568, 574.

roads, though dedicated to a public use, remain the private property of their owners, and their assets may not be taken without just compensation.[23] The Transportation Act has not abolished this proprietorship. State courts have uniformly held that to require extension of existing lines beyond the scope of the carrier's commitment to the public service is a taking of property in violation of the federal constitution.[24] The decisions of this court will be searched in vain for the announcement of any principle of Constitutional interpretation which would support the order of the Commission. The statements in *New England Divisions Case,* 261 U. S. 184, and *Dayton-Goose Creek Ry.* v. *United States,* 263 U. S. 456, in respect of the purposes of the Transportation Act, on which appellants rely, must be read having in mind the situations there presented and the nature of the orders approved. Care was taken in those cases to demonstrate that the sections upheld did not, in application, go beyond the regulation of rates and the disposition of the excess over a fair return collected by a carrier, and it was shown that no taking or confiscation of property resulted. Those decisions are far from sustaining the validity of an order which seeks to require the investment of millions of dollars in a new venture in undeveloped areas. Such a compulsion imposes upon the carrier and its property " burdens that are not incident to its engagement." *Northern Pacific Ry. Co.* v. *North Dakota,* 236 U. S. at p. 595. The

[23] *Interstate Commerce Commn.* v. *Chicago Great Western Ry. Co.,* 209 U. S. 108, 118; *Missouri Pac. Ry. Co.* v. *Nebraska,* 217 U. S. 196, 206; *Northern Pac. Ry. Co.* v. *North Dakota,* 236 U. S. 585, 595; *Great Northern Ry. Co.* v. *Minnesota,* 238 U. S. 340, 346; *Banton* v. *Belt Line Ry.,* 268 U. S. 413, 421.

[24] *Atchison, T. & S. F. Ry. Co.* v. *Railroad Commn.,* 173 Cal. 577; 160 Pac. 828; *Hollywood Chamber of Commerce* v. *Railroad Commn.,* 192 Cal. 307; 219 Pac. 983; *Public Service Commn.* v. *United Railways & Electric Co.,* 126 Md. 478; 95 Atl. 170; *Morgan Run Ry. Co.* v. *Public Utilities Commn.,* 98 Oh. St. 218; 120 N. E. 295.

construction we adopt makes it unnecessary to pass upon the grave questions of constitutional validity raised by appellants' argument.

It is urged that as the order involved trackage amounting to only 1.2% of that now maintained by the Union Pacific System, the requirement may properly be considered an extension rather than a new line, though a different view might prevail if the Oregon-Washington alone be considered. But whether the order be treated as a command to the Oregon-Washington Company as a separate corporate entity, or as an injunction to the Union Pacific System, it is an attempted exertion of a power not conferred. Assuming, without deciding, that the Commission was entitled to treat the Oregon-Washington company as an instrument of the Union Pacific System, and the required extension, therefore, as one adding only a small percentage to the present mileage of the system, still the purpose is to compel a new investment for the development of a new area at the request and in the interest of the State of Oregon, whose desire is that its natural resources shall be exploited.[25]

Finally it is claimed that however narrowly the power to compel extensions be construed, the order was justified by the facts developed before the Commission. They are said to disclose an undertaking by the Oregon-Washington Company to serve the region in question. Much

---

[25] The Commission said: "It is urged that Oregon's development, as compared with other States, has been held back and seriously hampered, due to the lack of direct routes to the markets for her products and that the construction of the proposed extension is an important part of anticipated development of adequate rail transportation facilities within the State. The evidence of complainant and defendants brings out clearly and forcibly that no section can develop without transportation. The major portion of the State of Oregon is without adequate transportation facilities and this is particularly true with respect to the portion which would be served by the proposed construction." 159 I. C. C. 635.

is made of the circumstance that when the complaint was filed the company had a charter under which it was authorized to build a line on the location of that which the order describes. The possession of the franchise is said to give rise to an implied agreement to serve the district. The company's having in contemplation the building of the road would in this view render the Commission's action unassailable. But authority to build the line, if the company were so minded, involved no commitment to construct it.[26] Though by appropriate legislation the State might forfeit the charter for non-user, the continued existence of the franchise imposed no obligation to exercise the charter powers. The Oregon-Washington Company chose not to serve the territory which the cross-state line would reach; has not desired and does not now desire to enter upon the project. The possession of a charter which would have made the building of a railroad legal is insignificant as to the company's actual undertaking. Whether the railroad held itself out to serve the region in question must be decided in the light of all the facts. The record demonstrates that the territory to be traversed was one the company had neither actually nor impliedly agreed to serve with transportation facilities.

The decree is                                          *Affirmed.*

Mr. Justice Cardozo, dissenting.

Unable to concur in the decision of the Court, I place upon record without extended argument the grounds of my dissent.

The Transportation Act of 1920 was framed with the design of securing to the United States an adequate and

---

[26] *Northern Pac. Ry. Co.* v. *Dustin,* 142 U. S. 492, 499, and cases cited; *Bentler* v. *Cincinnati, C. & E. Ry. Co.,* 180 Ky. 497; 203 S. W. 199; *State* v. *Public Service Commn.,* 287 Mo. 522; 229 S. W. 782. Compare *Railroad Commission* v. *Eastern Texas R. Co.,* 264 U. S. 79, 85

efficient system of railroad transportation. Everything contained in it with reference to extensions, voluntary and involuntary, is tributary to that end, and unless related thereto, is misconceived and misapplied. On the one hand, the carriers are to be permitted to make voluntary extensions of their lines, but only with the consent of the Commission, lest waste may otherwise ensue. *Texas & Pacific Ry.* v. *Gulf, C. & S. F. Ry.,* 270 U. S. 266, 277, 278. On the other hand, they are made subject to a correlative duty, if so ordered by the Commission, to build extensions, even though unwillingly, when transportation will otherwise be inefficient or inadequate. The limits of this duty are not appropriately defined by dividing the field into extensions big and little, with a power of regulation excluded from the one section and admitted in the other. On the contrary, the word extension is to be taken in no forced or artificial sense, but with the meaning attributed to it in the common speech of men. It does not fairly connote a prolongation so vast and sudden as to work an utter transformation of the character of the road, making what was extended the incident and the extension the principal. The action of the Commission must have a basis in reason, and its order must be viewed with reference to the length and other conditions of the line or lines to be enlarged. No doubt there is a point at which the enlargement of a road becomes " the construction of a new line " (par. 18) rather than the extension of an old one. On the other hand, the power of the Commission is not limited to extensions that are merely trivial. The purpose of the Congress to make the power more than this, to make it an effective instrument for the development of railroad transportation, is revealed at every step. It is revealed in the legislative history of the measure, and particularly in the report of the Commission explaining the mischiefs to be remedied and recommending the fitting

cure.* It is revealed very distinctly on the face of the statute, which provides that the extension may not be ordered without a certificate of convenience and necessity, nor ordered even then if the expense to be incurred " will impair the ability of the carrier to perform its duty to the public," a precautionary proviso that was omitted in the requirement of adequate facilities for car service contained in the same section, and that would surely have been thought to be superfluous if the subject matter of the extension was to be a short or unimportant spur. In the case at hand, the proposed addition increases only by 1.2 per cent the mileage of the Union Pacific System, and is to be laid across a region which the Oregon-Washington Railroad & Navigation Company, the subsidiary most directly affected, had marked out in its certificate of incorporation as territory that it planned to serve. An increment thus related to the thing to be increased is not so extraordinary in size, so lacking in proportion, as to remake or transform under the guise of improving or extending. *New York & Queens Gas Co.* v. *McCall,* 245 U. S. 345; *Woodhaven Gas Light Co.* v. *Public Service Commn.,* 269 U. S. 244; *United Fuel Gas Co.* v. *Railroad Commission,* 278 U. S. 300, 308, 309.

Another basis of division, in addition to that of size, is put forward in argument as separating the extensions that

---

* Of the four major recommendations made by the Commission in its annual report of December, 1918, the third was as follows: "(3) limitation of railway construction to the necessities and convenience of the Government and of the public, and assuring construction to the point of these limitations."

Accompanying these recommendations was a statement of their fundamental aim or purpose. "Whatever line of policy is determined upon, the fundamental aim or purpose should be to secure transportation systems that will be adequate to the Nation's needs, even in time of national stress or peril, and that will furnish to the public safe, adequate and efficient transportation at the lowest cost consistent with that service."

Congress had in view from others so substantial that they are to be taken as excluded. We are to find the test, so it is said, in the expectation or intention, presumable or actual, of the corporators or stockholders. The test, however, is illusory. If expectation or intention is the measure of the power of the nation, development must always wait upon the pleasure of the carrier affected. By hypothesis, the territory already served is the only territory that the carrier has evinced a willingness to serve. If its road is to be built for a greater distance or between other points, there is a frustration of its purpose that the terminus for construction shall be wherever stockholders and directors have willed that it shall be. In the thought of the lawmakers the power of the Government was not to be conditioned upon consent. It was to operate by compulsion upon whatever came within its sphere. The railroads of the nation had been brought together by the Transportation Act into a system of transportation national in its dimensions and under national control. Not the wishes of the component units, but the needs of the public which they are organized to serve, were to give the rule and measure for command and for obedience. Let expectation be the test, and cases such as *New York & Queens Gas Co.* v. *McCall, supra, Woodhaven Gas Light Co.* v. *Public Service Commn., supra,* and *United Fuel Gas Co.* v. *Railroad Commission, supra,* must have been decided otherwise than they were. In these instances and others, carriers serving a particular territory were compelled to serve another in response to a public need that the field of service be enlarged. *Railroad Commission of California* v. *Southern Pacific Co.,* 264 U. S. 331, is cited as pointing another way, but its implications are misread. Its precise holding is that an order of a state commission cannot coerce an interstate carrier to make extensive changes and relocations of its main tracks at great expense in connection with the construction of a

new union station, but that the consent of the Interstate Commerce Commission is necessary in such circumstances even though the new tracks are short. The case is far from holding, however, that the relevant sections of the Transportation Act apply to short additions to the exclusion of all others. On the contrary, the fact that the additions were "not great in distance," (p. 346) even though expensive, is recognized as giving color to the argument that no consent is necessary. "It is argued," wrote Chief Justice Taft (p. 344), " that paragraphs 18 to 21 of § 402 refer only to extensions of a line of railroad having the purpose to include new territory to be served by the interstate carrier and do not refer to an extension of new main track for the mere purpose of rearranging terminals within the same city. We do not think the language of paragraphs 18 to 21 can be properly so limited." In such words there is surely no suggestion that the power of the federal Commission is inadequate to compel an extension into territory not served, nor any acceptance of the test of presumable intention.

If the test proposed were not illusory, it would none the less be inappropriate. The time has gone by when the subjection of a public service corporation to control and regulation by the agencies of government is to have its origin and justification in the terms of a supposed contract between the corporation and the state. The origin of the subjection and its justification are to be found, not in contract, but in duty, a duty imposed by law as an incident to the enjoyment of a privilege. The discretion of managers and stockholders, at one time nearly absolute, is now subject in countless ways to compulsion or restraint in the interest of the public welfare. No longer may the carrier abandon any portion of its road without the consent of the Commission, though the portion to be abandoned has been operated at a loss. 41 Stat. 477 (18); 49 U. S. Code, § 1 (18). No longer, without the consent of

the Commission, may it extend the length of its road by its voluntary act. 49 U. S. Code, § 1 (18). No longer may securities be issued, in the form either of stock or of evidences of debt, unless the Commission has found the proposed action of the carrier to be compatible with the public good. 49 U. S. Code, § 20a. All these limitations upon ancient rights and privileges have had the approval of this court. The new act, said the Chief Justice in *Dayton-Goose Creek Ry. Co.* v. *United States*, 263 U. S. 456, 478, " puts the railroad systems of the country more completely than ever under the fostering guardianship of the Commission, which is to supervise their issue of securities, their car supply and distribution, their joint use of terminals, their construction of new lines, their abandonment of old lines, and by a proper division of joint rates, and by fixing adequate rates for interstate commerce, and in case of discrimination, for intrastate commerce, to secure a fair return upon the properties of the carriers engaged." The argument is not persuasive that alone among all these inroads upon the freedom of managerial discretion the provision for compulsory extensions is to be struck down as ineffective. As long as governmental orders are kept within the range of reason, their operation is unaffected by expectation or desire.

The Fifth Amendment of the Constitution is invoked by the carriers but invoked without avail. Consistently with that Amendment Congress may delegate to the Commission the power to force upon unwilling carriers an extension of their lines into fields of old service and of new. Much of what has been written in this opinion as to the meaning of the statute is pertinent also to an inquiry as to power. Again the thought is to be kept before us that the need of the public, not the acquiescence of the carrier, is the measure of the service, provided only that for such service there is adequate requital. Whether such requital has been assured is a question not susceptible of answer

except in the setting of the circumstances. Objection that it is lacking is to be viewed in the light of the entire scheme and framework of the Act of 1920, and of all the relevant provisions for the carriers' protection. There must be kept in view the provision whereby rates are to be maintained at such a level as to yield to the carriers of the country, or to the several groups into which they are to be divided, a fair and reasonable return, and whereby the surplus earnings of the strong roads may be recaptured and applied to the use of weaker ones. True indeed it is that courts are wont to lean to the construction of a statute that will avoid serious doubts of its validity, though they might hold it to be valid if pressed to a decision. *United States* v. *La Franca,* 282 U. S. 568, 574; *United States* v. *Jin Fuey Moy,* 241 U. S. 394, 401. Even so, they will not carry hesitation to the point of devitalizing the essence to preserve the husk alone. When the scheme of the Act is viewed in the totality of its meaning and probable operation, there is a quick end to the objection that in fixing the bounds of duty to render service to the public, the area of the possible must coincide, at least generally and roughly, with that of the actual and voluntary. Congress does not transcend the limits of the Constitution when it establishes a national system of transportation by rail. It does not transcend those limits when in aid of the system thus established, it lays a duty upon the railroads to furnish the extensions requisite for the attainment of the end in view. The conclusion is the same whether the immediate purpose of the order is to develop the resources of the country in territory contiguous to roads already built, or to promote the convenience of communities served imperfectly or not at all.

I have said that governmental orders to be valid must be kept within the range of reason. The record gives no support to a contention that those bounds have been exceeded. The cost of the improvement " will not impair

the ability of the carrier or carriers involved to perform their duty to the public." So the Commission finds, and the fact is not disputed. The improvement when made will be "a valuable asset to the Union Pacific System," and will be "an effective feeder for that system after a reasonable development period." This finding brings us into the realm of prophecy, and so, not unnaturally, into the field of contention and uncertainty. Much deference is due to the judgment of the Commission, "a tribunal appointed by law and informed by experience" (*Illinois Central R. Co.* v. *Interstate Commerce Commn.*, 206 U. S. 441, 454; *Virginian Ry. Co.* v. *United States*, 272 U. S. 658, 665). The conclusion that it has expressed is no arbitrary judgment, but has a basis of fact and reason in the pages of this record. But if doubt were greater than it is, the binding force of the decision would not thereby be defeated. The order of the Commission does not depend for its validity upon the certainty of a prophetic judgment as to all the consequences to follow. Once more we are to keep in mind the changes that have been wrought by the Transportation Act of 1920. In cases unaffected by that Act, two lines of decisions, following separate and yet neighboring channels, are to be found in the reports. The first, represented by *Northern Pacific Ry. Co.* v. *North Dakota*, 236 U. S. 585, 595, and *Brooks-Scanlon Co.* v. *Railroad Commn.*, 251 U. S. 396, is made up of cases where the return for particular services was considered in isolation without reference to earnings generally. The second, represented by *St. Louis & S. F. Ry. Co.* v. *Gill*, 156 U. S. 649; *Puget Sound Traction Co.* v. *Reynolds*, 244 U. S. 574; and *United Fuel Gas Co.* v. *Railroad Commission, supra*, is marked by the cases where the compulsory enlargement of the range of public service has been held to be permissible if the combined return is adequate for the system as a whole. By force of the Act of 1920, the zone has been narrowed for the application of

the principle which has illustration in the first group, and correspondingly widened for the application of the principle which has illustration in the second. Irrelevant, or nearly so, are the decisions of this court defining the jurisdiction of the Commission as it stood before the Act of 1920 had brought a new system into being. Irrelevant also are the decisions of state courts or of the lower federal courts determining the validity of very different statutes under which there are no compensatory guarantees to mitigate the burden of statutory duties, the carriers affected being viewed as separate units and not as members of a group. See, e. g. *Southern Bell Tel. & Tel. Co.* v. *Calhoun,* 287 Fed. 381; *Atchison, T. & S. F. Ry. Co.* v. *Railroad Commission,* 173 Cal. 577; 160 Pac. 828; *Hollywood Chamber of Commerce* v. *Railroad Commission,* 192 Cal. 307; 219 Pac. 983. For the first time in the history of our railroads a nationalized system of interstate transportation has made it necessary to consider the earnings of the system, or at least the earnings of the group, in determining whether rates or profits have been unreasonably reduced. There is nothing in this record to justify, still less to necessitate, the conclusion that as a result of the proposed extension the appellees, or the group of railroad carriers including them, were to be placed in such a position that it would be impossible thereafter, through any action of the Commission increasing rates or otherwise, to assure to them " a fair return upon the aggregate value of the railway property of such carriers held for and used in transportation." Interstate Commerce Act, § 15 a (2).

This Court has said of the Transportation Act of 1920 that it " seeks affirmatively to build up a system of railways prepared to handle promptly all the interstate traffic of the country." *Dayton-Goose Creek Ry. Co.* v. *United States,* 263 U. S. 456, 478.

The end is placed in jeopardy by a construction of the statute that debilitates the means.

52

The judgment of the District Court should therefore be reversed and the order of the Commission reinstated.

MR. JUSTICE BRANDEIS and MR. JUSTICE STONE join in this dissent.