## THE STATE ex rel. OZARK POWER & WATER COMPANY, Appellant, v. PUBLIC SERVICE COMMISSION and J. D. BROOKSHIRE HARDWARE COMPANY.

Division One, April 9, 1921.

1. **PUBLIC UTILITY: Compulsory Service: Unelected Territory.** The Public Service Commission has no power to make an order compelling an electric light company to furnish electricity to a town which is not a part of the territory it has undertaken to serve. Such compulsory service would be tantamount to an appropriation of the company's property to a public service to which it has not been dedicated, and would amount to the taking of private property for a public use without just compensation. But on the other hand, if the town is territory comprehended within the company's profession of service it may be required to serve it, because it is its duty, within reasonable limitations, to serve all in such territory who apply.

2. ———: ———: ———: **Question of Fact.** Whether or not an electrical company has undertaken to supply electricity to a certain territory is a question of fact to be determined by the evidence before the Public Service Commission, and will be determined by the Supreme Court, on review, unhampered by the findings of either the Commission or the circuit court; and where there is no express declaration of the territorial limits of its service, the fact may be determined by its charter and what it has done thereunder.

3. ———: ———: ———: **Charter Provisions.** The charter of a public service company empowering it "to generate, distribute and sell electric energy in Missouri and elsewhere, and to do all things incident thereto" is merely permissive, and does not require it, upon demand, to distribute and sell electricity everywhere in Missouri, nor can it be reasonably inferred that by accepting such charter power it undertook to furnish service in all parts of the State. But where, upon receiving such charter, it proceeded to localize the territory in which it proposed to operate, and applied for and received a franchise permitting it to erect poles for the suspension of electric light and power wires on and along the public roads and highways of Newton County, and obtained pole-line rights-of-way in Jasper, Lawrence, Christian, Greene and

State ex rel. Power Co. v. Publ. Serv. Commission.

Taney counties, applicable to all highways' alike, it will be held that it obtained franchises that covered all the highways in said counties, including the streets and thoroughfares of the town of Diamond, in Newton County, and that it undertook to serve, in some form, the inhabitants of said town with electricity, upon terms that are reasonable and fair.

4. ———: ———: ———: **Precise Service: Shown by Acts.** Where the public service company constructed a water-power plant for generating electricity in Taney County; built a transmission line from it northerly through Newton County to Joplin; erected a sub-station a mile east of Diamond, and from thence built additional lines extending to Granby and Neosho in Newton County; put in distribution systems at Granby and at Pierce City in Lawrence County; then began the operation of its plant and the distribution and sale of electric current; at Joplin and Neosho, sold and delivered electricity at wholesale to another electric company; at Granby and Pierce City, distributed and sold the current directly to consumers, it marked out for itself the precise service undertaken within the selected territory, and the inference from these constructions and operations necessarily is that it had undertaken not only to furnish electricity to the public at wholesale, but to distribute and sell it to the inhabitants of the towns and other populous centers in the selected district, including the town of Diamond. And the inference that Diamond was a community it had professed to serve is further enforced by the fact that its agent went there to ascertain how many of its residents would use the service.

5. ———: ———: **Reasonableness.** An electrical company is not required to furnish electricity to every village and hamlet within the boundaries of its professed service, unless such requirement is reasonable; and the reasonableness of an order of the Public Service Commission requiring it to serve a certain town depends ono whether it is arbitrary, capricious or unlawful. And where the facts demonstrate that the order is neither arbitrary nor capricious, it can be held to be unlawful only on the ground that it will operate to take the company's property for a public use without just compensation.

6. ———: ———: ———: **Unlawful: Just Compensation.** Where the order of the Public Service Commission requiring an electrical company to distribute and sell electricity to the inhabitants of a certain town does not appropriate such property to a public use to which the company has not already dedicated it, and the evidence shows that furnishing the service will not entail even a present financial loss, and that the gross revenue will be sufficient to cover depreciation and the cost of operation and to insure an ade-

quate return on the investment, the order cannot be held to operate to take the company's property for a private use without just compensation, but is a reasonable and lawful one.

7. ——: ——: Choosing Towns Within Selected Territory  Where the effect of its occupying a selected territory by a public service corporation is to exclude therefrom other public service utilities and to leave unserved the communities therein it does not choose to serve, it will not be permitted to pick and choose and serve only the portion of the territory covered by its franchise which is presently profitable to it.

Appeal from Cole Circuit Court.—*Hon. J. G. Slate,* Judge.

AFFIRMED.

*A. E. Spencer* for appellant.

(1)  The Public Service Commission has not the power to order relator to enter and serve the new territory embraced in the settlement of Diamond, against the judgment and will of the officers and management of the relator, and where it does not render any service in the vicinity of Diamond, and such new territory is not part of some territory relator has theretofore undertaken to serve.  State ex rel v. Public Service Com., 270 Mo. 442, 446; People ex rel. v. Willcox, 200 N. Y. 431; Atchison, T. & S. Ry. Co. v. Railway Commission, 173 Cal. 577, 160 Pac. 828; Towers v. United Rys. & El. Co., 126 Md. 478; Public Service Com. v. Philadelphia Ry. Co., 122 Md. 438; Northern Pac. Ry. Co. v. Railroad Com., 58 Wash. 360; City of Scranton v. Scranton Ry. Co., P. U. R. 1915, C, p. 890; In re North Lincoln Tel. Co., P. U. R. 1917, A, p. 609; Frank Turnbull Co. v. Sweetwater Water Co., P. U. R. 1915 E, 629; 1 Wyman on Public Service Corporations (1911 Ed.), sec. 267, p. 237, sec. 273, p. 242, and sec. 276, p. 246.  (2)  Even if the transactions with George Clark in 1913 amounted to an agreement to furnish electricity to the persons with whom he dealt, these transactions could only constitute separate and individual contracts with each of such par-

ties, and the power to enforce any such agreement would rest with the courts of this State. Atchison, T. & S. Ry. Co., v. Railroad Commission, 173 Cal. 577; House Furn. Co. v. Union El. Light & Power Co., 2 Mo. P. S. C. 656, P. U. R. 1916, B, pp. 645-656.

*R. Perry Spencer,* General Counsel, and *James D. Lindsay,* Assistant Counsel, for Public Service Commission; *Grover C. James,* for Brookshire Hardware Company.

(1) The order is one authorized by the provisions of the Public Service Commission Law, is reasonable, and not violative of any constitutional or other fundamental right of the appellant. It is practicable to supply the needs of the community involved, and the obligation rests upon appellant to do so. Public Service Act, Section 16, Subdivision 5; Section 68; Section 69, Subdivisions 1 and 2; People ex rel. New York Gas Co. v. McCall, 219 N. Y. 84, P. U. R. 1917, A, 553, 245 U. S. 345; People ex rel. Gas Co. v. Deehan, 153 N. W. 528; Railroad Co. v. Jacobson, 179 U. S. 287; Oregon R. & N. Co. v. Fairchild, 234 U. S. 529. (2) The conclusions reached by the New York Court of Appeals, and approved by the Supreme Court of the United States, upon a statute identical with, and precedent to, the Missouri statute, upon facts parallel with those found in this case, should be regarded here as authority controlling in reason and persuasiveness. The report of the decision of the New York Commission will be found in P. U. R. 1915, B. 821; and the report of the decision of Appellate Division of the Supreme Court, First Department, New York, will be found in 157 N. Y. Supp. 707, P. U. R. 1916, D, p. 91.

RAGLAND, C.—This is an appeal from the judgment of the Circuit Court of Cole County affirming an order of the Public Service Commission, requiring relator to furnish electric service to the inhabitants of Diamond, in Newton County.

Relator is a public service corporation engaged in the business of generating, distributing and selling to the public electric energy for light and power. It was incorporated under the laws of this State in 1911. The purposes for which it was formed, according to its charter, were:

"To generate, distribute and sell electric energy and supply water and water power in Missouri and elsewhere, . . . to acquire the consent of Congress to dam navigable streams, to dam other streams as provided by law, to use eminent domain as provided by law, to acquire franchises from municipalities . . . and to do any and all things and acts connected with or appertaining to or in any manner affecting the business of generating, distributing and selling electric energy and water."

In 1912 it obtained from the County Court of Newton County a franchise authorizing it to erect and maintain poles and wires for electric light and power upon, along and across the highways of that county. It acquired similar franchises in Jasper, Lawrence, Christian, Greene and Taney counties. At the time of the making of the order of which relator complains, and for several years before that time, it owned and operated a water-power plant on the White River at Powersite, in Taney County. The electric energy generated there, it distributed and sold. Its entire plant and equipment, employed in its business of generating, distributing and selling electric energy, it valued at $2,200,000. In 1918 it sold 37,000,000 kilowatt hours of electricty; a large part of this was sold to other public utilities, but relator itself served the cities of Granby and Pierce City. During that year and previously, relator delivered large quantities of electricity to the Empire District Electric Company at Joplin. This latter company and relator occupied in part the same field. The Empire District Electric Company was engaged in the production and sale of electricity in Jasper and Newton counties in this State and in some of the counties just across the State line in Kansas. It distributed and sold electricity in Neosho, and in practi-

cally all of the cities and villages in Jasper County. Its franchise covered both counties, Newton and Jasper. The two corporations were officered, in part at least, by the same individuals, and an agreement existed between them for an exchange of electrical current in case the supply of either should fail. The gross operating revenue of relator in 1918 was $235,018.11; that of the Empire District Electric Company in 1917, $1,357,264.96.

Diamond is an unincorporated town and has a population of about five hundred. The town contains twelve mercantile concerns, one bank, two mills, one elevator, two garages, three churches, a school building and one hundred residences. The population has increased thirty-five per cent within the last five years. Relator owns and operates a line of poles and wires extending from its dam at Powersite to Joplin for the transmission of electricity for distribution and sale. The line was built in 1913, and it passes along a public road through Newton County. Relator erected a sub-station on the line at a point one mile east of the business center of Diamond. At this sub-station electricity is taken from the transmission line on which it is carried at 66,000 volts and its voltage reduced for transmission on lines owned by relator to the near-by towns of Granby and Neosho.

George Clark, an employee of relator, went to Diamond in the year 1913, in behalf of relator, with a view to selling its inhabitants electricity, the same to be furnished by relator by a line to be constructed from its sub-station on the transmission line to the town. Clark canvassed the town, offering the residents electricity at the same rate as that charged at Granby, which was ten cents per kilowatt hour. Practically all of the persons he called upon agreed to take electricity. Soon afterwards he again came to Diamond, accompanied by a representative of a company engaged in selling and installing wires and electrical equipment. Clark represented that it was agreeable to relator for this company to install the wires in the houses at Diamond, and that relator would be ready to deliver electricity there when

the wiring was completed. Thereupon the owners of fifteen houses had them wired and equipped ready to receive electricity. After the wiring was completed in November, 1913, and from time to time during the ensuing period of about five years, residents of Diamond called upon relator and urged that it construct the line from its substation and give them electric service. Relator at such times promised, rather evasively, that it would build the line as soon as it could get to it. Finally, in 1918, relator announced that Diamond did not offer sufficient business to justify the preliminary expenditure that would be necessary to enable it to furnish the service, but that if the people of Diamond would build out to the substation it would sell and deliver to them there electricity at wholesale.

Relator's vice-president, B. C. Adams, testified that Clark had no authority to bind it to furnish electrical service at Diamond; that it was the established policy of his company to not even consider building into a community like Diamond, unless and until, from previously gathered information, it appeared that a profitable business could be secured; and that pursuant to its customary methods, Clark was sent to Diamond merely to ascertain how many people would use lights if the company concluded to build in and offer the service.

Mr. Adams further testified that relator, by extending its service into Diamond, would sustain an annual loss of $712.50. He based his estimates on the assumption that fifty customers could be procured. From these customers, by charging them at the rate of ten cents a kilowatt hour, with a minimum of one dollar per month, a gross annual revenue of $1050 would be obtained. As against this he estimated the annual operating expense for the service at $506.50, and depreciation and return —on $5,749.56, the cost of the additional construction required, and on $3,920, the proportionate part of the plant investment chargeable to Diamond—at $1,256, making a total of $1,762.50.

In relator's estimates six per cent was allowed for depreciation and seven per cent for return on the investment. The Commission ruled that six per cent was excessive for annual depreciation; that four per cent would fully cover it. As thus modified, relator's estimates indicate that there would be an annual deficit of $520. This amount the Commission held could. be overcome by applying a rate of fifteen cents per kilowatt hour, with a monthly minimum charge of one dollar and fifty cents, instead of ten cents per kilowatt, used by relator as the basis of its calculations. Thereupon the Commissio° made an order requiring relator to extend its line to Diamond and to furnish electric service there, on the condition: that residents of Diamond would, within thirty days thereafter, by written agreement, obligate themselves to take electric service from relator for one year, through at least fifty different service connections, and to pay therefor at the rate of fifteen cents per kilowatt hour, with a monthly minimum of one dollar and fifty cents for each service connection. Within the designated time eighty residents of Diamond obligated themselves, conformably to the Commission's conditional order, to take electric service from relator. The order was made final December 18, 1919.

Some of the facts relating to the territory covered by the Empire District Electric Company and relator, the character and extent of the service rendered by them therein and the relation existing between the two companies, appear solely from annual reports made by them to the Public Service Commission, which were by reference incorporated in the report and finding of the Commission in this case. · No objection to their consideration, on that ground, however, has been raised, and their correctness is not called in question.

Relator resists the order of the Public Service Commission on this ground: The proposed improvement and extended service involves the entry by relator into new territory and the rendering of service to a community which it does not serve and has not in

287 Mo.—34

the past served, and which its management, as a matter of business judgment, has determined not to serve and, therefore, as a matter of law, the Commission is without power or authority to order relator to give such service. It concedes that the Commission has the power to direct and control its operations and the service rendered by it, as a public service corporation, in territory in which it has elected to enter and has undertaken to render service, but plants itself squarely on the proposition that Diamond is not such territory.

I.  If it be true, as relator contends, that Diamond is not a part of the territory it has undertaken to serve, then unquestionably the Commission was without power to make the order under consideration. The **Elected Territory: Compulsory Service.** Public Service Commission Law (Sub-division 2, sec. 10478, R. S. 1919) confers upon the Commission "power to order reasonable improvements and extensions of the works, wires, poles, lines, conduits, ducts and other reasonable devices, apparatus and property of . . . electrical corporations . . . ." This power, however, must be deemed to be one within constitutional limitations. So construed, it does not give the Commission authority to compel relator to serve a territory not embraced within its profession of service. Such compulsion would be tantamount to an appropriation of relator's property to a public service to which it has not dedicated it—a taking of private property for public use without just compensation. [Atchison, T. & S. Ry. Co. v. Railroad Comm., 173 Cal. 577.] For notwithstanding relator is employing its plant and equipment in a public service, they still remain its private property, and the public may not assume the role of general manager and require such property to be used in a service to which the owner has not voluntarily dedicated it. [Interstate Commerce Comm. v. Railroad, 209 U. S. 118.]

On the other hand, if Diamond is territory comprehended within relator's profession of service, relator may be required to serve it, because it is relator's duty, within reasonable limitations, to serve all in such ter-

ritory who apply. [New York & Queens Gas Co. v. Mc-
Call, 245 U. S. 345; Lukrawka v. Water Co., 169 Cal.
318; Wisconsin Railroad Co. v. Jacobson, 179 U. S. 287;
Woodhaven Gaslight Co. v. Deehan, 153 N. Y. 528.]

II.    The question of relator's profession of public
service is essentially one of fact and it is our province
to determine that fact from the evidence that was before
the Public Service Commission, unhampered either by
its finding with respect thereto, or by the con-
clusions reached by the circuit court which re-
viewed it. [Sec. 10522, R. S. 1919; State ex rel.
Railroad v. Pub. Service Com., 271 Mo. 155.]

*Selected Territory.*

It was not shown that relator had ever made any ex-
press declaration with reference to the territorial limits
upon the service professed by it. But its charter, fran-
chises and acts, in the conduct of its business, may as
clearly evidence those limits as would an explicit dec-
laration on its part. [1 Wyman on Public Service Cor-
porations, sec. 220.] Relator's charter empowers it "to
generate, distribute and sell electric energy in Missouri
and elsewhere, and to do all things incident thereto." The
charter in this respect is permissive merely. It does not
require relator, upon demand, to distribute and sell elec-
tricity everywhere in Missouri; nor can it be reasonably
inferred that by accepting such charter power it under-
took  to furnish service in all parts of the State.  Upon
receiving its charter, however, relator proceeded to local-
ize the territory in which it proposed to operate; it ap-
plied for and received a franchise permitting it to erect
poles for the suspension of electric light and power wires
on, along, under, and across the public roads and high-
ways of Newton County. It obtained pole-line rights-of-
way in Jasper, Lawrence, Christian, Greene and Taney
counties. It is inferable from the record as a whole that
the franchises granted it by the counties last named were
similar in all respects to the one given it by Newton Coun-
ty. In this connection it will be noted that relator did
not seek permission to erect its poles and wires merely

along some of the highways in the district that it marked off as the field of its operations—it obtained franchises that covered all the public roads and highways therein, including the streets and thoroughfares of Diamond. Where an electrical corporation obtains a franchise to occupy with its wires and equipment all of the streets and alleys of a municipality, there is never any question as to the territory that it is undertaking to serve. It seems equally clear that relator in this case, by applying for and obtaining franchises covering the whole of six contiguous counties in Southwest Missouri, expressly defined the exterior limits of its profession of service, territorially considered.

What precise service relator has undertaken within the territory it marked out for itself is next to be considered. It constructed a water-power plant for generating electricity in Taney County; it built a transmission line from it northerly through Newton County to Joplin; it erected a sub-station a mile east of Diamond and from thence built additional lines, extending to Granby and to Neosho in Newton County and probably to other points; it put in distributing systems at Granby and at Pierce City in Lawrence County; and then it began the operation of its plant and the distribution and sale of electrical current. At Joplin and Neosho it sold and delivered it at wholesale to the Empire District Electric Company; at Granby and Pierce City it distributed and sold the current directly to the consumers. From these constructions and operations the inference necessarily arises that relator has undertaken not only to furnish electricity to the public at wholesale, but to distribute and sell it to the inhabitants of the towns and other populous centers in its district. Is Diamond such a community as it has professed to serve? Undoubtedly, else it would not have sent its agent there to ascertain how many of its residents would use the service.

III. Relator may not be compelled to furnish electrical service to every village and hamlet in the six

counties covered by its franchises. Nor can it be required to furnish such service to Diamond, notwithstanding it is within the boundaries of relator's professed service, un-

**Reasonableness.** less such requirement is reasonable. This brings us to a consideration of the reasonableness of the Commission's order. The reasonableness of the order, in the sense in which we may determine it, in the exercise of judicial power, depends on whether it is, or is not, arbitrary, capricious, or unlawful. [Section 10522, R. S. 1919; State v. Great Northern Ry. Co., 130 Minn. 57.; People v. McCall, 219 N. Y. 84.] That it is not arbitrary, or capricious, so fully appears from the statement of facts that a further consideration of it in that respect is unnecessary. If it is unlawful, it is because it operates to take relator's property for a public use without just compensation. As we have seen, the order does not effect an appropriation of such property to a public service to which relator has not dedicated it. An additional test remains to be applied: Does there exist a reasonable expectation that the consumption of electrical current at Diamond will be sufficient to warrant the necessary preliminary expenditure? [Pub. Service Corp. v. American Lighting Co., 67 N. J. Eq. 122, 131.] The evidence shows that the furnishing of the service will not entail even a present financial loss; that the gross revenue derivable from it will be sufficient to not only cover depreciation and the cost of operation, but to afford relator, in addition thereto, an adequate return on its investment. We hold that the order requiring relator to supply Diamond with electrical current for lighting purposes is a reasonable one.

IV.  The situation in general outline, as disclosed by the evidence, seems to be this: Two public service corporations, relator and its ally, the Empire District **Picking** Electric Company, have marked off a portion **Territory:** of Southwest Missouri for the field of their operations; within this territory they have constructed water-power plants, enabling them to produce electrical

current at the lowest cost, and have strung along the highways their transmission lines; here and there throughout the territory they have selected such of the towns and centers of population as seemed the most attractive from the standpoint of profits; and these they are supplying with their service. The effect of their so occupying the territory is to exclude therefrom other public service corporations, with the result that the smaller communities that they do not supply must go unserved. In this connection the language of Mr. Justice CLARK in New York & Queen's Gas Co. v. McCall, 245 U. S. 351, is apposite:

"Corporations which devote their property to a public use may not pick and choose, serving only the portions of the territory covered by their franchises which it is presently profitable for them to serve and restricting the development of the remaining portions by leaving their inhabitants in discomfort without the service which they alone can render."

It follows from the conclusions reached that the judgment of the circuit court should be affirmed. It is so ordered. *Brown* and *Small, CC.,* concur.

PER CURIAM:—The foregoing opinion of RAGLAND, C., is adopted as the opinion of the court. All of the judges concur, except *Elder, J.,* not sitting.