STATE EX REL. FEDERAL RESERVE BANK OF KANSAS CITY, v. THE PUBLIC SERVICE COMMISSION.—191 S. W. (2d) 307.

Kansas City Court of Appeals. December 3, 1945.

*Sebree, Shook & Gisler, Elmo B. Hunter* and *Edgar Shook* for appellant.

532

534

*John P. Randolph, Ludwick Graves* and *James H. Ottman* for respondent.

BLAND, P. J.—This is an appeal from a judgment affirming an order of the Public Service Commission. The appellant, the Federal Reserve Bank, (hereinafter referred to as the Bank), is a corporation and, as such, owns a bank and office building in Kansas City. The defendant, in the proceedings before the Commission, the Kansas City Power & Light Company, (hereinafter referred to as the Light Company), is a public utility engaged in the manufacture, transmission, distribution and sale of electrical energy to the public in Kansas City, Missouri, and vicinity. The Bank for 20 years was a regular, full-use and continuous customer of the Light Company, using in its building energy supplied and provided for under contracts and schedules as filed with the Public Service Commission. The energy supplied was furnished at 13,000 volts. The Light Company owned and operated the necessary equipment and sub-stations for delivering the energy to transformers and other necessary equipment owned and maintained by the Bank. The transformers of the Bank reduced the energy from 13,000 volts to a voltage suitable for use throughout the Banw and the bank building.

In 1940 the Bank determined to install its own electrical generating equipment and, in that year, did install its own power plant, consisting of three engines capable of producing 250 kilowatts each. The maximum demand of the Bank itself and its tenants at that time was less than 500 kilowatts, so that it had an excess or standby capacity

equivalent to 50% of its maximum demand. Any two of its engines were sufficient to carry its load. Nevertheless, because large and important operations and services, governmental and otherwise, including the storage of large sums of money and valuables in its vaults and the operation of tabulating, calculating, sorting and other machinery and appliances with electrical energy, and the functions of many persons among its employees, and its tenants, were dependent upon an uninterrupted source of electricity, the Bank deemed the provision of standby or breakdown service to be furnished by the Light Company imperative.

On May 29, 1940, the Bank gave the Light Company notice that the contract for electric current was being terminated and requested the Light Company to submit to it a rate covering standby or emergency service to protect the Bank and the tenants in the building in which the Bank is located in case of failure on the part of the generating system of the Bank. It did not contemplate and did not seek to secure auxiliary or standby power to be used in supplement and in connection with power produced by it. It did not and does not resell to others than the tenants in its building. The Bank requested the Light Company to submit to it a reasonable rate covering the requested breakdown service—i. e., electrical energy to be supplied in the event of failure for any reason of the Bank's facilities. It was advised by the Light Company that it had no such rate available. Although it appears to be the general policy of the Light Company to claim that it is not required to furnish any service to customers who provide any facilities for the production of their own mechanical or electric power, nevertheless, it entered into negotiations with the agents of the Bank attempting to arrange a schedule of rates suitable to the Bank's peculiar situation. None of the rates offered was acceptable to the Bank and, on March 6, 1941, it filed its application with the Public Service Commission for standby breakdown or emergency service to itself and for the determination of a fair and reasonable schedule of rates covering such service. Meanwhile, the connection of the service wires was continued. (Standby, breakdown and emergency service, each has been separately defined but, for the purposes of this case, they may be treated as identical.)

After hearing the evidence the Commision made its Report and Order, which recites:

"Since placing in operation its own generating equipment, the bank has not paid any charges for the arrangement continued since September 1, 1940, by which it might expect to receive service from the defendant, should its plant and facilities fail to supply its need, pending negotiations for a proper determination of a fair and proper charge to be made for such arrangement. The rates and conditions under which the defendant would furnish the service contain the following availability clauses:

"The rate is available to any customer operating an isolated electric plant or using some form of mechanical power for driving his equipment, and the Company shall not be required, under such circumstances, to render standby power under General Lighting and Power Rate, (which is described in the Report and Order) . . . but all such service shall be rendered said consumer under this schedule, or any subsequent revisions thereof. Subject to Rules and Regulations filed with the Public Service Commission. Available for lighting and/or power purposes and applicable to consumers using some form of mechanical power or operating an isolated electric plant and not using exhaust steam for process work.

"Available to all consumers having a Demand of seventy-five (75) kilowatts or more, who are located in areas served by lines distributing unregulated power as generated with no transformation between the generators and the consumer's equipment. Consumers must provide and maintain all high voltage equipment necessary to utilize current at the generated voltage.

"The defendant (the Light Company) states that the complainants involved in this case can be placed in three classes—(1), the consumer who wants to install or has installed a power plant of sufficient capacity to carry his entire load and desires a connection with the system of the defendant through a throwover switch whereby he may, in case of a breakdown in his own plant, immediately throw his entire load on to the facilities of the defendant (the Light company). (2), the consumer who wants to or has installed a power plant of sufficient capacity to carry his entire load, and at certain times wants to shut down his own plant and have available an amount of energy from the lines of the defendant (the Light Company) of sufficient quantity to meet his reduced requirements of lighting and power. (3), the consumer who wants to install or has installed a power plant for the operation of only a certain part of his equipment, and wishes to contract for energy with which to operate certain other pieces of equipment which cannot be connected or operated from his own plant without certain additions thereto, such as an extension of a line or the installation of a generator. Included in the partial service the consumer might want to purchase, would be the lighting of the premises that he is occupying in case he is using mechanical power without a generator.

"The defendant (the Light Company) states that for the past number of years it has been attempting to arrange its schedules of rules and regulations by which it fixes the rates and defines the conditions under which it might furnish service to consumers who produce any of their power requirements by facilities owned and operated by the customer. It defines the bank as a 'non-standard' customer.. While this process of so developing the schedules and conditions under which such service would be furnished progressed, the bank installed

and put into operation its own plant. The defendant (the Light Company) states that the bank ordered it to discontinue electric service to that institution as of July 30, 1940, then subsequently asked the defendant (the Light Company) to continue the service for another thirty days, then for a ninety day period during which time it expected to have in full operation its own plant. During that time a representative of the bank discussed the matter of securing standby service from the defendant. The defendant (the Light Company) offered standby service under three different arrangements and schedules. The representative of the defendant (the Light Company) suggested a schedule for a complete standby service whereby the defendant would be obligated to take and carry the entire load of the bank when and if necessary, taking such service at 13,200 volts through the facilities previously and then used to serve the bank. The defendant also offered a rate designated as 'Rate B' providing a minimum demand of 15 kilowatts providing the bank would maintain the 13,200 volt equipment required to secure the service at that voltage from the defendant. The above conditions involved furnishing of energy as alternating current. The defendant also offered to furnish direct current service under either of the above schedule B and C. It appears that these offers were not acceptable to the bank.

"Reviewing the schedules that have been filed, the defendant shows that by its 'Exhibit A' it proposes to furnish service to the bank, charging therefor a rate of $2.15 per kilowatt of demand per month with a minimum of 1 kilowatt, plus four and three-tenths cents per kilowatt hour for the energy, the bank to stipulate the demand and install a current limiting device fixing the maximum load obtainable thereunder at 125 per cent of the load specified. The energy would be taken at 110 and 200 volts. Under 'Exhibit B' the bank would agree to contract for a maximum demand of 15 kilowatts or more at the rate of $5.13 per kilowatt, plus 1.14¢ per kilowatt hour for the energy consumed, the energy to be taken at 110 and 200 volts. Under 'Exhibit C' the service would be furnished at a rate of $5.00 per month per kilowatt of contracted demand and 50 kilowatt hours per kilowatt of demand with a minimum load of 5 kilowatts, and an excess energy charge of 4¢ per kilowatt hour. The energy to be taken at 110 and 229 volts with current limiting device provided to control the maximum amount contracted for. The bank would be permitted to use a throwover switch but could not parallel its equipment with that of the defendant. Under 'Exhibit D' the bank would be allowed to take service at a charge of $2.98 per kilowatt of demand, plus 4.56¢ per kilowatt hour, the demand to be limited to 125 per cent. of the amount contracted for, voltage at 110 and 220 volts. Under 'Exhibit E' the bank would be permitted to take service at a rate of $2.00 per unit (kilowatt) billing demand with a minimum of two units for secondary service and seventy-five units for primary power service

but not less than the installed capacity of the transformer, the energy charge to be 4.0¢ per kilowatt hour; or the bank may take service at the appropriate rate in its schedule, providing the customer guarantees one of the following minimum bills:

"(1) $5.00 per unit of demand for service at a Commercial Lighting and Small Power Rate (Minimum demand—1)

"(2) $4.25 per unit of demand for service at a Secondary Demand Rate (Minimum demand—10)

"(3) $3.50 per unit of demand for service at the available Primary Rate (Minimum demand—75)

"The above charges provide for throwover switches. If the bank or customer does not use a throwover switch the minimum billing demand charge shall not exceed $2.50 per unit.

"The bank took the position that no one of the offers, as well as those appearing in the above schedule, was acceptable to it. The bank's engineer took the position that he thought no one of the schedules a fair and reasonable rate under the conditions the bank desires the service. The engineer is of the opinion there should be a separate rate filed for that class of breakdown service.

"The Bank claims that it has operated its plant for a period of two years and has not had to call upon the defendant (the Light Company) for service at any time. It takes the position that it is prepared to serve itself under all expected causes of failure of its plant and yet desires a connection with the defendant's (the Light Company) system should any unforeseen or unexpected accident happen that might cause it to desire service from the defendant (the Light Company). . . .

"The service required by regular customers of the defendant establish either daily, weekly, monthly or annaully, certain uses of the service by which the expected loan of those classes of customers will use facilities of the defendant (the Light Company). For example, the residential customer may use a large load in the evening of every day tapering off throughout the night and again increasing to some extent throughout the daytime following and back to the night load. Industrial power customers however, require their maximum usage during the daytime. Street Lighting Service produces a large load during each night and none during the day. With all of these users of the service a cycle of demands is established from which a diversity factor can be found, which enables one versed in the art to estimate in a general way how the plant facilities and the cost of the service that should be allocated to those respective classes. But since there is no group of customers of the class of the defendant who profess they will not need the service yet demand a connection to the system should such contraposition be made, we have no way of developing a class rate. The bank asks the Commission to establish a rate by which

it should pay for the privilege of being connected to the system of the defendant. . . .

"There is another relationship between the bank and the defendant that should be discussed because of the unusual conditions obtaining. Practically all users or prospective users of service profess that they expect to use the service at one time or another and expect to pay according to that professed or accepted usage. The bank claims it will not need the service, placing it outside of all standard classifications of customers of the defendant. The defendant has been granted a certificate of convenience and necessity to operate its facilities for the purpose of furnishing service to its customers but not to those who profess they will not need the service. Were all of the customers to profess they will not need the service a certificate of convenience and necessity could not be granted on the grounds that the public would be served and the revenues therefrom would be such as to justify the use of monies for the construction of the plant or for the securing of the necessary funds to operate it. A public utility cannot exist under such circumstances, so the bank is in the position of, someone who can only ask for the use of the facilities of the defendant because those facilities have been installed for the use of the general public but held in reserve until the growth of the load or other cause may require the use of the facilities so held in reserve. A utility of the character of the defendant must necessarily provide a greater amount of capacity in its system than is needed for the immediate load. The bank professing to not need that capacity under any foreseeable conditions can only ask to be allowed to be connected with the unused capacity during the time that it is not required for the use of the public and the Commission is of the opinion that is the only capacity the bank could expect to have available for it. Under such circumstances we do not see the necessity for the defendant to file a schedule of rates applicable to that customer because that customer does not belong to any class by which rates can be established. The defendant will have certain expenses in maintaining that connection and the facilities. The bank should pay those expenses. The schedules now in effect, or those offered by the defendant in this case, are ample to take care of the requests of the bank and the defendant should make such connections as are necessary to serve the bank. The facilities installed by the defendant from its system to the bank to the point where connection is made to the facilities of the bank, plus the necessary office expense of keeping a customer record should be the basis of the charges to be made for the connection desired by the bank. Should the bank call upon the defendant for services now unforeseeable the regular schedule as applied to such service should be the basis of the charges for whatever load the bank may take at the particular time under the terms and conditions provided for in the schedule, which schedule provides that the demand established at any par-

ticular time shall continue for a period of twelve months. So if the bank should use the service at any time and establish a demand it will become a classified customer by its act and continue to pay at the proper class rate so long as it uses service up to and including a twelve month period. Then, if it uses the service only for a temporary period of time until it can get its own plant back into operation, at the end of twelve months it will go back to the basis of charge as set out above''.

It was ordered by the Commission: ''That the Kansas City Power & Light Company make arrangements to furnish service if demand is made by the Federal Reserve Bank for a relatively small quantity of service, not to be considered as less than 20 kilowatts, paying therefor the monthly charge of $2.00 per month per kilowatt plus an energy charge of 4¢ per kwh used, and if said bank does not desire to contract for the taking of any electric energy but desires a connection with the system of the Kansas City Power & Light Company in order that it may call upon said defendant for service up to its maximum load requirements it shall' pay therefor an annual minimum charge equivalent to 16 2/3 per cent of the cost of installing the necessary facilities for providing such connection and should energy be used, pay therefor the regular rate applicable to that type of customer for a period of twelve months following the establishment of the maximum demand taken at the time of the delivery of the energy, with the privilege of returning to the original status at the end of said period of twelve months.''

It is insisted by the Bank that it has the legal right to the electric energy that it may need at any time unqualified by the availability of it after provision is made for other customers of the Light Company; that the Report and Order unlawfully fails to impose any positive obligation on the Light Company to provide the excess energy from which the Bank could be served, or to inform the Bank when the excess capacity is insufficient to provide for its full demand; that the Commission failed to prove breakdown service to the Bank to which it had a legal right, under reasonable terms and at a reasonable charge.

There is no question but that a utility, such as the Light Company, is obliged to serve on reasonable terms all those who desire the service that it renders without unreasonable discrimination. [43 Am. Juris. 586; 29 C. J. S. 536; State ex rel. Laundry, Inc., et al. v. Public Service Comm., 34 S. W. (2d) 37, 44; State ex rel. Ozark Power & Water Co. v. Public Service Comm., 229 S. W. 782; Rogers Iron Works, Inc. v. Joplin Waterworks et al., 18 S. W. (2d) 420, 422; Section 5645 R. S. Mo. 1939.]

Whether there has been any discrimination in a given case depends, of course, upon the facts. In this case they are peculiar. As pointed out by the Commission in its Report and Order, the Bank has its own

electric generating facilities, together with its own standby service, which is of the same character usually maintained by public utility lighting companies generally. Its own facilities had been in operation for more than two years at the time of the hearing and there had been no occasion, up to that time, for the Bank to call upon the Light Company for any energy. Under these circumstances the Commission was fully justified in holding that the position of the Bank was that of one who desires a connection with the Light Company's system when it will never avail itself of the service under any foreseeable conditions, and that no class rate could be developed to fit the Bank's condition.

The Light Company rates or charges, in almost all cases, are composed of a demand and energy charge. (As to residential customers the demand charge is included in the energy charge.) It is conceivable that all of its customers might use their maximum demands coincidentally and, theoretically, it would be required to have sufficient generating facilities and other equipment to take care of those demands. But, in practice, no such situation develops. One witness testified that if such a condition occurred a light company would not have the capacity to furnish the energy; "that it would shut the equipment down instantly". There are characteristics in the use of electricity peculiar to different classes of users so that a cycle of demand can ordinarily be established and a class rate developed. The Report and Order in discussing this feature refers to a "diversity factor". In this connection the term "diversity factor" has been variously defined and many elements enter into its makeup. The Report and Order sufficiently describes what it consists of as related to the situation in this case. There is much in the record as to whether there is a diversity factor in favor of the Bank, notwithstanding its peculiar situation. The Bank's engineer took the position that, in view of the fact that it had never been necessary for the Bank to call upon the Light Company for excess energy, since the installation of the Bank's plant, and the Bank had in reserve capacity of 50% over and above its highest demand, the burden upon the Light Company to provide standby or emergency service would be slight and, for that and other reasons, there was a considerable diversity factor involved favorable to the Bank.

The witnesses for the Light Company took the opposite view, which view was accepted by the Commission.

It appears that the Bank occupies more of a position of a prospective customer of the Light Company than an actual customer. In such circumstances it has been said: "All seem to agree that one service classification should cover breakdown and auxiliary service. Indeed, it would be most difficult to separate one from the other and limit service to a genuine case of breakdown of a private plant". [Re New York Edison Co. Inc., et al., 16 Pub. Utilities Rep. 120, 125.] A

contrary position is apparently taken in Nacogdoches Light & Power Co. v. Thompson and Richardson, 138 S. W. 1080. As the Commission, in effect, provided for breakdown service in this case we are not called upon to decide which of these authorities is correct. There is ample evidence to justify the conclusion of the Commission that no class rate could be formulated in this instance.

We do not agree with the Bank's statement that no breakdown service was required in the Report and Order. In fact, it appears that the Bank was given its choice among several kinds of services. Exhibit E is a standby rate applicable to customers of the type of the Bank, providing for service at the rate of $2.00 per kilowatt hour of demand contracted for, plus a charge of 4¢ per kilowatt hour for energy if the Bank wants to use energy at any time. If the Bank desires to avail itself of the service it may contract for. Whatever amount it may deem necessary to take care of any possible breakdown. The minimum (75 K.W. of demand) under Exhibit E would be $1,710 per annum. If the Bank deemed that insufficient, such as to keep an elevator and necessary light on in order to repair a complete breakdown, and thought that 100 K.W. of demand necessary, that would cost $2,280 per annum. It could contract for 300 K.W. at a cost of $6,840 per annum, or, if it thought that it should need its full maximum demand of 451 K.W., it would cost $10,658 per annum. (These sums take into consideration the fact that a 5% discount is provided on account of the Bank furnishing its own transformer and other facilities.) The Bank would pay 4¢ per K.W. for the actual current used under these circumstances. It would be only in case of a breakdown or change in conditions where a new higher demand was established from the original demand contracted for under Exhibit E that the Bank would have the privilege of going to its appropriate rate for the newly established demand and condition, as it has always been the practise of the Light Company (one that is required by regulating agencies of all light companies) to put customers on the schedule that would give them the lowest rate per kilowatt hour.

Under these circumstances, if it were found that it would take a great deal of time to repair the Bank's equipment it might be advantageous to the Bank to revert, for a period of one year, to the original 13,200 volt schedule at $6,558.00 for demand and a lower energy charge.

It was disclosed during the hearing that the Bank was interested in an auxiliary rate with a small demand, such as Exhibit C, with the privilege of going on to their old 13,200 rate in the case of a serious breakdown and the establishment of a demand. This was the rate based upon the lowest demand offered the Bank by the Light Company. The Bank, no doubt, was interested in this, in that, a breakdown might affect but two of the three engines and require only a short time to make repairs and if it occurred on a day such as

Sunday or a holiday, when the Bank was closed and there were few people in the building, it might need only a small amount of current until the repairs could be made and it would be unnecessary for it to establish a higher demand and pay for the same.

The Commission in its Report and Order attempted to furnish a rate to meet the wishes of the Bank in this respect with a minimum of demand of not less than 20 K.W. Under the Report and Order, if the Bank desired the auxiliary service of a small demand, and to use energy thereunder, it can contract for whatever demand it desires, with a minimum of 20 K.W. and the Light Company would be under legal duty to reserve capacity for the demand contracted for. If the Bank should suddenly increase its demand, because of some unforeseeable cause, it would have to notify the Light Company of its increased demand. Then the Light Company would be required to provide for the reserve capacity needed.

While the Light Company's offered rates were suspended by the Commission, upon the objection of the Bank, Exhibit E was finally approved by the Commission, as clearly indicated by the recitation in the Report and Order as follows: "The schedules now in effect, *or those offered by the defendant in this case,* are ample to take care of the requests of the bank". (Italics ours.)

While it appears that the schedules offered by the Light Company were not formally approved by the Commission, there is no doubt that if the Bank thinks such a step is necessary, the Commission will take it upon application by the Bank. As those rates were not acceptable to the Bank the Commission may not have thought it necessary formally to approve them.

The cost of operating the Bank's plant being approximately $16,000 per annum, the breakdown service provided by the Commission, no doubt, seems high to the Bank. However, this apparent high charge is due to the Bank's peculiar situation and the extraordinary character of service sought by it.

The Bank says that it has been unlawfully discriminated against, in that, if it creates a demand, it is required to pay under the same schedule that governs the rates of full-use customers; that "the Bank's need is not that of a full-use customer. It knew the charges for that service without resorting to the Public Service Commission. . . . To subject the Bank to an order to pay for a year the same demand charge paid by others who take all their energy from the utility when the Bank's need may endure for a few minutes or a few hours has no basis in logic or fairness." It is hardly right to say that the Bank is put upon the same footing as a full-use customer. It would be only when it was to the Bank's advantage that it would revert to the schedule offered full-use customers. If it contracted for a small deman and did not exceed it there would be no change. If it did exceed the demand contracted for its demand would be increased only

under the standby rate for the next twelve months and if was advantageous to the Bank it could use service under this standby rate until it had fixed its plant. But if it was to its advantage, when it had breached the demand contracted for and established a new demand, to go to the regular rate of a full-use customer, then and in that event it should go to the regular rate because it would be to the Bank's advantage to do so and the Light Company is required to give the lowest rate applicable.

It is contended by the Light Company that the Bank is demanding standby and breakdown service and is not willing to pay for such service. We do not so construe the Bank's contention. As we understand its position it is willing to pay any demand charge that is reasonable for breakdown service; but it says that it is unreasonble that it be required to pay the same demand charge as made against a full-use customer. As pointed out by the Report and Order of the Commission, under the Bank's peculiar circumstances, there is nothing upon which a class rate can be evolved to meet the situation. Therefore,, the Light Company must hold in reserve the maximum demand contracted for by the Bank. It is not unreasonable for it to pay the same demand charge required of a full-use customer when its demand has been established. If the Bank desires the Light Company to reserve energy for it it should pay for that service. Under the evidence in this case it would cost as much to hold in reserve for the Bank a certain demand where the Bank would not use any energy at all, as it would to hold in reserve a demand for a customer which uses only partial service in the form of energy, or a customer that uses all of its energy requirements. If the Light Company reserved for the Bank its demand at a lesser rate than for its partial-use customers or its full-use customers, there would be a discrimination in favor of the Bank against the other classes of customers.

It is claimed by the Bank that, under any of the schedules of the Light Company approved by the Commission, it is not even given the right to service of a full-use customer; that the Report and Order only requires that the Bank be served with the unused capacity of the Light Company when not required by others. We do not so understand the Report and Order. It is claimed that this is the purport of a letter written to the Commission by the Light Company attempting to construe the Report and Order. Even if this be true, the letter is not binding on the Commission.

We cannot say that the requirement to pay the demand charge, when it is contracted for or created, over a period of twelve months is unreasonable. This is according to the practise of the Light Company in all instances. Presumably it costs money to create energy that must be held for the use of a customer, whether it be a full-use customer or one that may, at any time, call upon the Company to

furnish its maximum requirements for electricity, and the customer should pay for the energy over a reasonable period.

There was nothing unreasonable in the action of the Commission in providing, in the Report and Order, that the Bank, if it merely desired to be connected with the lines of the Light Company, without paying a demand charge, to require that the Light Company be under the duty merely to provide such energy as was not being used by regular customers. It would have been discriminatory for the Commission to have required the Light Company to furnish energy without a preference to the other customers who were paying a demand charge. If the Bank does not pay a demand charge, such as paid by practically all regular full-use customers and partial-use customers of the Light Company, then it would be a discrimination in favor of the Bank and not against it, to accord it the same service as such other regular customers. There may be some few exceptions where the Light Company does not make a demand charge; but it may be stated, generally, that any rate based upon any other method is not made in conformity with the general usage of such company and, as we understand the evidence of the Light Company, it clearly is guilty of a discriminatory practise, at least as to some of the excepted cases.

It was not unreasonable for the Commission to require the Bank to pay a demand charge if it wanted to call on any energy of the Light Company, other than from its reserve. In fact, as we have stated before, it would have been a discrimination against other customers of the Light Company had such not been provided in the rates and services provided by the Public Service Commission in this case.

The Report and Order is not unreasonable because it fails to require the Light Company to inform the Bank when the excess capacity is insufficient to provide for the full demand of the Bank. It seems to be the position of the Bank that the defendant should, at all times, keep in general reserve the full 451 kilowatts of demand for the Bank, and to inform the Bank should the excess capacity go below its maximum demand of that number of kilowatts. Presumably it costs the Light Company considerable outlay to keep track of its reserve which it should not be required to expend when the bank is not paying for any reserve.

The fact that on account of the Bank's peculiar situation, it may appear to it that the demand charges, provided in the schedules approved by the Commission, were large does not necessarily mean that they are unreasonable. It is not within the province of this court to formulate rates for service, nor, are we equipped to do so, nor, are we empowered to outline a method or theory upon which such rates should be fixed. These are matters for the Commission. The only jurisdiction we have is to determine whether the orders made by the Commission are unreasonable and unlawful. [State ex rel. Detroit-Chicago

546

Motor Bus Co., Inc., v. Public Service Commission, 23 S. W. (2d) 115, 117.] All rates and schedules fixed by the Commission are *prima facie* lawful (section 5702 Revised Statutes Missouri 1939) and the burden is upon the Bank to show by clear and satisfactory evidence that the determination order of the Commission is unreasonable. [Section 5703 Revised Statutes Missouri 1939.] The Bank claims that the Report and Order was unreasonable and, therefore, unlawful. We cannot agree with this contention.

There is no evidence from which we may determine whether, upon some equitable consideration, it may be held that the Bank is entitled to some consideration not given regular customers by reason of the large unused or surplus energy that might be created if the Bank chose to come under some of the provisions of the schedules contemplating the use of a large amount of energy by the Bank when, under no foreseeable circumstances will any of the energy ever be used. Whether there is any theory under which this surplus energy is otherwise valuable to the Light Company, we are not advised. In fact, no point is made in the briefs relative to such a matter.

Some mention is made in the brief of the Bank that the Commission acted under a misconception of the Bank's position in the matter, in that, in places in the Report and Order, there appear such statements as "the bank claims that it will not need the service". "There is no group of customers of the class of defendant who profess they will not need the service". "The bank professing to not need the service under any foreseeable conditions". The Bank claims that its position was that it needed breakdown service. To be strictly accurate perhaps it would be proper to say that the Bank needs service but it will not avail itself of it under any foreseeable condition. From a reading of the Report and Order, as a whole, it is apparent that the Commission did not misunderstand the Bank's position.

The judgment is affirmed. All concur.